# In re R-S-J-, Respondent

*Decided June 10, 1999*

U.S. Department of Justice
Executive Office for Immigration Review
Board of Immigration Appeals

For purposes of section 101(f)(6) of the Immigration and Nationality Act, 8 U.S.C. § 1101(f)(6) (1994), false oral statements under oath to an asylum officer can constitute false testimony as defined by the United States Court of Appeals for the Ninth Circuit in *Phinpathya v. INS*, 673 F.2d 1013 (9th Cir. 1981), *rev'd on other grounds*, 464 U.S. 183 (1984).

Madan Ahluwalia, Esquire, San Francisco, California, for respondent

Richard C. Cunan, Assistant District Counsel, for the Immigration and Naturalization Service

Before: Board En Banc: DUNNE, Vice Chairman; HOLMES, HURWITZ, FILPPU, MATHON, GUENDELSBERGER, JONES, GRANT, and SCIALABBA, Board Members. Concurring and Dissenting Opinion: VACCA, Board Member, joined by SCHMIDT, Chairman; HEILMAN, VILLAGELIU, COLE, and ROSENBERG, Board Members.

GRANT, Board Member:

In a decision dated May 17, 1996, the Immigration Judge denied the respondent's applications for suspension of deportation and voluntary departure.[1] The Immigration Judge found that the respondent could not establish that he had been a person of good moral character for the requisite statutory periods because he found that the respondent had provided false testimony in the course of his earlier interview with an asylum officer of the Immigration and Naturalization Service. The respondent appeals. The issue raised by the respondent is whether false oral statements made under oath to an asylum officer can constitute "false testimony" under section 101(f)(6) of the Immigration and Nationality Act, 8 U.S.C. § 1101(f)(6) (1994), as defined by the United States Court of Appeals for the Ninth

---

[1]The record reflects that the respondent abandoned his application for asylum and withholding of deportation at the hearing before the Immigration Judge.

Circuit. The respondent contends that they do not because the asylum officer is not a "tribunal." We reject this argument and hold that false statements under oath to an asylum officer can constitute false testimony for purposes of section 101(f)(6) of the Act. The appeal will therefore be dismissed. However, because it is not clear whether the false statements admitted to in this case were made under oath, the record will be remanded.

## I. FACTS

The relevant facts of this case are straightforward and not in dispute. The respondent filed an Application for Asylum and Withholding of Deportation (Form I-589) with the San Francisco Asylum Office of the Service on October 18, 1995. The application was prepared by another individual. The respondent admitted that he signed the application, after it had been mailed to him in New York, knowing that it was false, "because he told me that under this made up story is [sic] many cases he has filed and they had been successful." On November 29, 1995, the respondent appeared in San Francisco for an interview on the application before an asylum officer. When questioned about the facts related on the application, the respondent answered according to the false story provided to him. The respondent later admitted to the Immigration Judge that the story he related to the asylum officer "was false." The asylum officer did not testify before the Immigration Judge regarding what transpired at the interview, and no written record of the interview was presented to the Immigration Judge. The respondent has not alleged that he was not put under oath by the asylum officer, but there is no affirmative evidence that an oath was administered.

## II. THE "FALSE TESTIMONY" BAR TO FINDING GOOD MORAL CHARACTER

An alien applying for suspension of deportation bears the burden of establishing statutory eligibility for the relief as well as showing that he warrants a favorable exercise of discretion. *See* section 244(a)(1) of the Act, 8 U.S.C. § 1254(a)(1) (1994). To be statutorily eligible for suspension of deportation, an alien seeking relief must show that he has been physically

---

[2] We need not determine the effect of section 309(c) of the Illegal Immigration Reform and Immigrant Responsibility Act of 1996, Division C of Pub. L. No. 104-208, 110 Stat. 3009-546, 3009-627 (effective Apr. 1, 1997) ("IIRIRA"), *amended by* section 203(a) of the

present in the United States for a continuous period of not less that 7 years immediately  preceding the date of such application;[2] that during such period he was and is a person of good moral character; and that deportation would result in extreme hardship to the alien or his spouse, parent, or child, who is a citizen of the United States or an alien lawfully admitted for permanent residence. *Id.*

Section 101(f)(6) of the Act states that "[n]o person shall be regarded as, or found to be, a person of good moral character who . . . has given false testimony for the purpose of obtaining any benefit under this Act." This provision of the Act has been the subject of numerous judicial and administrative  decisions. The Supreme Court has held that section 101(f)(6) of the Act does not impose a materiality requirement for false testimony, but noted that such testimony "is limited to oral statements made under oath . . . with the subjective intent of obtaining immigration benefits."  *Kungys v. United States*, 485 U.S. 759, 780 (1988). Hence, false statements which appear in an application, even if the application bears a statement of oath, do not constitute testimony within the meaning of section 101(f)(6) of the Act. *Matter of L-D-E-,* 8 I&N Dec. 399 (BIA 1959). However, where false statements are uttered orally under oath, they have been held to constitute false testimony within the meaning of section 101(f)(6) of the Act. *See, e.g., Matter of Barcenas*, 19 I&N Dec. 609, 612 (BIA 1988) (false statements at deportation hearing). Moreover, it has long been held that such statements need not be uttered in administrative or judicial proceedings, but can include statements made under oath to government officials, including Service officers and consular officials. *Matter of Namio*, 14 I&N Dec. 412, 414 (BIA 1973) (false statement under oath to a border patrol agent); *see also, e.g., Liwanag v. INS,* 872 F.2d 685 (5th Cir. 1989) ("false testimony" to a Service officer during an investigation); *United States v. Baumann*, 764 F. Supp. 1335 (E.D. Wis. 1991) ("false testimony" both in application for a visa at an American consulate and in an application for citizenship); *United States v. Koziy,* 540 F. Supp. 25 (S.D. Fla. 1982) (same); *Matter of Ngan*, 10 I&N Dec. 725 (BIA 1964) ("false testimony" to a Service officer in connection with processing a visa petition); *Matter of G-L-T-,* 8 I&N Dec. 403 (BIA 1959) ("false testimony" to a Service officer in connection with an  application

Nicaraguan and Central American Relief Act,  Pub. L. No. 105-100, tit. II, 111 Stat. 2193, 2196 (Nov. 19, 1997) ("NACARA"), on the respondent's application for suspension of deportation because the respondent met the 7 years' continuous physical presence requirement prior to the Service's issuance of an Order to Show Cause and Notice of Hearing (Form I-221).

to replace a certificate of citizenship); *cf. Matter of M-*, 9 I&N Dec. 118 (BIA 1960) ("false testimony" to an Immigration officer at an airport with voluntary and timely retraction). Likewise, false statements made under oath during an interview regarding an application for naturalization have been consistently held to constitute false testimony. *In re Yao Quinn Lee v. United States,* 480 F.2d 673 (2d Cir. 1973); *Berenyi v. District Director, INS*, 352 F.2d 71 (1st Cir. 1965), *aff'd*, 385 U.S. 630 (1967); *United States v. Abdulghani*, 671 F. Supp. 754 (N.D. Ga. 1987); *see also Kungys v. United States, supra,* at 806 (White, J., dissenting).

The Ninth Circuit, in which this case arises, has held that such oral statements must be made "to a court or tribunal." *Phinpathya v. INS,* 673 F.2d 1013, 1018-19 (9th Cir. 1981), *rev'd on other grounds*, 464 U.S. 183 (1984). Thus, this requirement by the court adds another element to the analysis whether an alien has given "false testimony" within the scope of section 101(f)(6) of the Act. The respondent contends that his admitted oral misrepresentations to an asylum officer do not constitute "false testimony," because such statements were not made to "a court or a tribunal." As the respondent acknowledges, the Ninth Circuit has not defined what constitutes "a court or tribunal." However, in a decision issued while this appeal was pending, the Ninth Circuit held that false statements made under oath during a naturalization examination constitute false testimony within the meaning of section 101(f)(6) of the Act. *Bernal v. INS*, 154 F.3d 1020 (9th Cir. 1998). For the reasons set forth below, we find it appropriate, consistent with *Bernal*, to rule that false statements under oath to an asylum officer, whose authority to administer oaths and take testimony is parallel to that of a naturalization examiner, and whose authority to grant benefits under the Act is arguably greater, likewise constitute "false testimony" for purposes of section 101(f)(6) of the Act.

### III. WHETHER THE ASYLUM OFFICE CONSTITUTES A "TRIBUNAL"

The respondent argues that asylum officers cannot constitute a "tribunal" because they are not "judges" and "have not been given judicial power as has been conferred upon them by law as an immigration judge." However, it is clear both that the definition of a tribunal is broader than the scope of those holding judicial office, and that Immigration Judges are not the only "tribunal" within the immigration system.

Webster's Dictionary defines "tribunal" as "a person or body of persons having authority to hear and decide." *Webster's Third New International Dictionary* 2441 (P. Gove ed. 1986). According to *Black's Law Dictionary* 46 (6th ed. 1990), an "administrative tribunal" is "a particular administrative agency before which a matter may be heard or tried as distinguished

from a judicial forum." In *United States ex rel. Alaska Smokeless Coal Co. v. Lane,* 250 U.S. 549, 551 (1919), the Supreme Court found that the General Land Office is a tribunal, not merely a ministerial office, because "like any other tribunal[,] its institution and purpose defin[e] and measur[e] its power, the determining elements being those of fact and law, upon which necessarily judgment must be passed."

Thus, the fundamental attributes of an administrative tribunal are its authority to hear and decide; its administrative nature; and its authority to render judgments in accordance with the facts and the law. Based on these characteristics, we can readily determine that the Asylum Office, which is a division of the Office of International Affairs in the Immigration and Naturalization Service, *see* 8 C.F.R. §§ 100.2(d)(3)(ii), 100.4(f) (1999), constitutes a form of "administrative tribunal."

The asylum officers assigned to each Asylum Office are designated as "immigration officers" and are "authorized to exercise the powers and duties of such officer as specified by the Act and [by regulation]." 8 C.F.R. § 103.1(j) (1999). Among those powers and duties are those set forth in pertinent part in section 235(a) of the Act, 8 U.S.C. § 1225(a) (1994), prior to its amendment by the Illegal Immigration Reform and Immigrant Responsibility Act of 1996, Division C of Pub. L. No. 104-208, 110 Stat. 3009-546 (" IIRIRA"):

> The Attorney General and any immigration officer, including [Immigration Judges], *shall have power to administer oaths and to take and consider evidence* of or from any person touching the privilege of any alien or person he believes or suspects to be an alien to enter, reenter, pass through, or reside in the United States *or concerning any matter which is material and relevant to the enforcement of this Act and the administration of the Service, and, where such action may be necessary, to make a written record of such evidence*. . . . The Attorney General and any immigration officer, including [Immigration Judges], shall have power to require by subpena *the attendance and testimony of witnesses* before immigration officers and [Immigration Judges] and the production of books, papers, and documents . . . . (Emphasis added.)

The successor provisions to section 235(a) of the Act grant similar authority to immigration officers. *See* sections 235(d)(3),(4) of the Act, 8 U.S.C. §§ 1225(d)(3), (4) (Supp. II 1996). Furthermore, the status of asylum officers as "immigration officer[s] who . . . ha[ve] had professional training in country conditions, asylum law, and interview techniques" is now specifically recognized in section 235(b)(1)(E)(i) of the Act.

The first highlighted clause in the preceding excerpt from section 235(a) of the Act establishes that the authority of asylum officers, as immigration officers, extends to administering oaths and taking and considering oral evidence. Since "testimony" is the form of evidence that consists of oral statements made under oath, *Kungys v. United States, supra*, asylum officers, like other immigration officers, are empowered to take testimony. The final highlighted clause, referring to the power to

compel "testimony" by subpoena, confirms this authority.[3]

Yet, the authority of the asylum officer extends further, to that of determining whether an alien is eligible under the law and merits a favorable exercise of discretion to be granted asylum under section 208 of the Act, 8 U.S.C. § 1158 (Supp. II 1996), or whether the alien is entitled to withholding of deportation under section 243(h) of the Act, 8 U.S.C. § 1253(h) (1994). *See* 8 C.F.R. § 208.14 (1999); 8 C.F.R. § 208.16 (1997). Such decisions are guided by statute, a detailed series of regulations, the precedent decisions of this Board, and any binding precedents of the federal courts. An asylum officer's decision to grant such relief is, subject to supervisory review within the Asylum Office, final and unreviewable. Further evidence of the adjudicative role of the asylum officers is found in the language of the statute. Section 235(b)(1)(E)(i) of the Act identifies asylum officers under sections 235 and 208 of the Act as "adjudicators" of asylum applications. *See also* 8 C.F.R. § 103.1(g)(3)(ii) (1999) (giving asylum officers "authority to hear and adjudicate"). These factors lead us readily to conclude that the Asylum Office is a "tribunal" as that term is employed in the Ninth Circuit's ruling in *Phinpathya v. INS, supra*.[4]

Although the concurring and dissenting opinion argues to the contrary, the weight of Ninth Circuit precedent supports the conclusion that the

---

[3]The concurring and dissenting opinion dismisses this argument as a "syllogism" and contends that because these provisions are located in a subsection with the heading "Authority Related to Inspections," they should not be construed to apply to asylum officers. *See* section 235(d) of the Act. The Supreme Court rejected a similar argument in *United States v. Minker*, 350 U.S. 179 (1956). *Minker* held that the plain language of former section 235(a) of the Act "encompasses the full range of subjects covered by the statute" and that such plain language may not be limited by the title of the statute or the heading of a section. *Id.* at 185. *Minker* further held that, in the absence of a specific statutory directive, a naturalized citizen could not be compelled by the witness subpoena authority in section 235(a) of the Act to provide testimony for the purpose of determining whether good cause exists to institute denaturalization proceedings against that citizen. *Id.* at 187-88. This holding of *Minker* has not been extended to aliens or even to citizens who are subpoenaed to testify as witnesses in cases involving other citizens. *See Sherman v. Hamilton*, 295 F.2d 516, 518 (1st Cir. 1961) (stating that the alien's reliance on *Minker* to limit the scope of an immigration officer's investigatory authority was "wholly misplaced"), *cert. denied*, 369 U.S. 820 (1962); *United States v. Zuskar*, 237 F.2d 528, 531-32 (7th Cir. 1956) (holding that a United States citizen subpoenaed to testify as a *witness* under authority of section 235(a) of the Act cannot quash the subpoena under authority of *Minker*), *cert. denied sub nom. Budzilein v. United States*, 352 U.S. 1004 (1957); *cf. Lee Tin Mew v. Jones*, 268 F.2d 376 (9th Cir. 1959) (involving a section 235(a) subpoena quashed under *Minker* in the case of a person claiming to be a citizen).

[4]While asylum officers no longer deny asylum in the case of an applicant who appears to be excludable, deportable, or removable under the Act, 8 C.F.R. § 208.14(b)(2), they retain the authority to deny asylum in the case of applicants who are maintaining valid nonimmigrant status. 8 C.F.R. § 208.14(b)(3). Asylum officers must communicate the denial by letter to the applicant, stating the reasons for the denial and assessing the applicant's credibility. 8 C.F.R. § 208.17 (1999).

Asylum Office, like other administrative decision-making bodies, constitutes a "tribunal." The Ninth Circuit has found that oral statements under oath before an Immigration Judge constitute false testimony for purposes of section 101(f)(6) of the Act. *See, e.g., Paredes-Urrestarazu v. INS*, 36 F.3d 801 (9th Cir. 1994) (finding that false oral statements given before an Immigration Judge constitute "false testimony"); *see also Matter of Barcenas, supra*. An alien appearing before an asylum officer has many rights similar to an alien in deportation proceedings before an Immigration Judge. In proceedings before Immigration Judges and asylum officers, an alien has the right to be represented by counsel and to have an opportunity to present evidence, witnesses, and testimony. *Compare* 8 C.F.R. §§ 208.9(b), (d)-(g) (1999) *with* 8 C.F.R. §§ 3.16, 3.31, 3.34, 3.37 (1999). The regulations at 8 C.F.R. § 208.13(a) (1999), which clearly apply to asylum officers as well as to Immigration Judges, refer to statements made by asylum applicants as "testimony." In addition, like an Immigration Judge, an asylum officer has the authority to administer oaths, to receive evidence, including testimony, to maintain a record, to consider the evidence, and, most importantly, to decide the merits of the asylum application. *Compare* 8 C.F.R. §§ 208.9(c)-(f) *with* 8 C.F.R. §§ 3.31-3.37 (1999). Given that Immigration Judges and asylum officers have analogous authority over asylum claims, we find that there is sufficient support for concluding that an alien's sworn false oral statements before an asylum officer, like sworn false oral statements to an Immigration Judge, can constitute "false testimony" as defined by the Ninth Circuit. *Phinpathya v. INS, supra.*[5]

Further support is found in case law regarding sworn oral statements before naturalization examiners. In *Bernal v. INS, supra*, at 1022-23, the Ninth Circuit found that false oral statements given under oath to Service officers during naturalization examinations constitute "false testimony" for

---

[5]The concurring and dissenting opinion also argues that the Asylum Office is not a tribunal, apparently because asylum officers exercise none of the official, judicially reviewable authority contemplated by the Supreme Court when, in *Chadha v. INS*, 462 U.S. 919, 966 (1983), it distinguished between the roles of Congress and of an administrative agency. The argument is curious and misplaced. The Asylum Office was created as a forum for the adjudication of asylum claims within the Service, independent from its "enforcement" components, to be guided by the rules and principles of refugee and asylum law, and certainly to be free from political pressure. *See* 55 Fed. Reg. 30,674, 30,679 (1990); 54 Fed. Reg. 28,964, 28,971 (1989). It would seem, therefore, that the Asylum Office is the quintessential type of administrative tribunal, the independence of which *Chadha* was designed to uphold. Moreover, for reasons already discussed, the dissent's implication that the Asylum Office operates outside the bounds of established substantive rules, and in that regard is to be distinguished from the Immigration Court, is simply unfounded. There *are* differences between the Immigration Court and the Asylum Office, both as to the scope of their jurisdiction and the manner of their proceedings. However, the more informal and nonadversarial type of proceeding before the Asylum Office does not dictate that the office is not a "tribunal."

purposes of section 101(f)(6) of the Act, and it cited favorably this Board's holding in *Matter of Ngan, supra*, at 729, that a respondent's oral false statements, under oath, before an officer of the Service in connection with the processing of a visa petition, constitute "false testimony" under section 101(f)(6) of the Act. *See also, e.g., United States v. Ciurinskas*, 148 F.3d 729 (7th Cir. 1998), *aff'g* 976 F. Supp. 1167 (N.D. Ind. 1997); *Yao Quinn Lee v. United States, supra; In re Haniatakis*, 376 F.2d 728, 730 (3d Cir. 1967); *Aboud v. INS*, 876 F. Supp. 938 (S.D. Ohio 1994); *United States v. Schiffer*, 831 F. Supp. 1166 (E.D. Pa. 1993), *aff'd*, 31 F.3d 1175 (3d Cir. 1994); *United States v. Abdulghani, supra; United States v. Palciauskus,* 559 F. Supp. 1294 (M.D. Fla. 1983), *aff'd*, 734 F.2d 625 (11th Cir. 1984); *Petition of K,* 174 F. Supp. 343, 344 (D. Md. 1959). In *Bernal v. INS, supra,* the Ninth Circuit held that a Service officer is "authorized 'to take testimony concerning any matter touching or in any way affecting the admissibility of any applicant for naturalization, [and] to administer oaths.' 8 U.S.C. § 1446(b). Thus, the statements made by an applicant in a naturalization examination are 'testimony' within the meaning of 8 U.S.C. § 1101(f)(6)."[6] *Id.* at 1023. The Ninth Circuit further found that "false oral statements made under oath in a question-and-answer statement before an INS officer in connection with any stage of the processing of a visa constitute false testimony within the meaning of 8 U.S.C. § 1106(f)(6)." *Id.*

We note that a naturalization examiner and an asylum officer both preside over proceedings in which they have authority to administer oaths, take testimony, and receive evidence. *See* section 235(a) of the Act; *compare* 8 C.F.R. § 208.9(c) *with* 8 C.F.R. § 335.11(b) (1999). However, the asylum officer has authority which exceeds that of the naturalization examiner. Naturalization examiners merely recommend a course of action, 8 C.F.R. § 335.12 (1999), whereas asylum officers may grant relief and, under certain circumstances, deny relief. 8 C.F.R. §§ 208.14(b)(1), (4). Thus, the status of asylum officers as part of a decision-making tribunal is at least as firmly established as that of naturalization examiners. *Bernal v. INS, supra; Phinpathya v. INS, supra; see also Kungys v. United States, supra; United States ex rel. Alaska Smokeless Coal Co. v. Lane, supra.*

Accordingly, we conclude that an asylum officer is a member of a "tribunal" for purposes of the false testimony bar to establishing good moral

---

[6]The concurring and dissenting opinion makes a lengthy attempt to differentiate the roles of naturalization examiners and asylum officers. We note that in *Bernal*, the Ninth Circuit fairly succinctly determined that false oral statements made under oath before a naturalization examiner constitute false testimony. Despite the length of its argument, the concurring and dissenting opinion fails to overcome the common sense conclusion that the adjudicative authority of asylum officers and naturalization examiners are analogous, and therefore that false oral statements made under oath which constitute false testimony before one also constitute false testimony before the other.

character under section 101(f)(6) of the Act, as that provision has been construed in the Ninth Circuit.

## IV. WHETHER THE RESPONDENT'S STATEMENTS CONSTITUTE "TESTIMONY"

Under *Phinpathya v. INS, supra,* and other precedents construing section 101(f)(6) of the Act, "false testimony" must not only have been made to a "tribunal," and thus not include written statements or applications, but must also have been made under oath. *Id.* at 1019; *see also Bernal v. INS, supra*, at 1022-23; *Matter of Ngan, supra*, at 729. As noted, an asylum officer has the authority to administer oaths, 8 C.F.R. § 208.9(c), and statements made by an asylum applicant to an asylum officer are described as "testimony" in 8 C.F.R. § 208.13(a). However, there is no evidence in the record, nor any contention on appeal, regarding whether an oath was administered in this case. Thus, while we affirm the Immigration Judge's finding that the false statements admittedly made in this case were made to a "tribunal" for purposes of Ninth Circuit law, we cannot, on the basis of this record, determine whether such statements constitute "false testimony." Accordingly, we will remand the record for consideration of this question.

The dissenting and concurring opinion appears to argue, however, that even if an oath was administered in this case and there is no factual dispute over the nature of the respondent's false statements to the asylum officer, the respondent's false statements cannot constitute "testimony" because they were not recorded verbatim by a disinterested transcriber, as in judicial proceedings, or set forth in a written question-and-answer format. However, given the provisions of 8 C.F.R. § 208.9, it is unclear that the respondent's asylum interview was not conducted in a manner at least as formal as that which apparently occurred in *Bernal v. INS, supra*.[7]

The chief characteristics of "testimony" are that it be delivered by a competent witness under oath. "Testimony is a particular kind of evidence that comes to a tribunal through live witnesses speaking under oath or affirmation in presence of tribunal, judicial or quasi-judicial." *Black's Law Dictionary, supra*, at 1476. There is no requirement that such evidence be transcribed in order to be counted as testimony. The contrary contention is somewhat startling, especially in the context of immigration proceedings. Immigration Judges customarily render decisions on the basis of oral testimony, immediately at the conclusion of such testimony, without the benefit

---

[7]In *Bernal,* the Service officer "recorded Mr. Bernal's pertinent answers on the interview form and annotated the form in red ink." Bernal v. INS, supra, at 1022.

of any transcription other than their personal notes. The fact that such testimony has been tape-recorded and thus is capable of being transcribed is irrelevant. Once the witness is sworn before the Immigration Judge, as before any tribunal, what is then said by the witness constitutes testimony. The tapes of testimony remain untranscribed unless an appeal is taken to this Board. Neither the act of transcription nor the existence of a written transcript confers testimonial character upon the evidence.

The same is true in judicial proceedings, particularly criminal trials. While a verbatim record is kept and a transcript may thereafter be prepared by a court reporter, jurors may render their decision solely upon their recollection of testimony presented by the witnesses and other competent evidence. Jurors may request "read-backs" of selected portions of the proceedings, but testimony so recalled attains no greater weight than that recalled through the conventional exercise of memory. Other tribunals, such as small- claims courts and traffic courts, render thousands of adjudications yearly on the basis of sworn, but untranscribed, testimony.

The dissent's argument seems more directed at the burden of proving whether false testimony has occurred in the course of an asylum officer interview. Here, there is no question that false statements were made. The respondent acknowledged that he was aware of the falsity of the asylum claim. However, he filed the "made up" asylum claim because it had been "successful." The respondent further admitted that when he was interviewed by the asylum officer, he repeated the false asylum claim. *See In re Haniatakis, supra* (finding that where an alien's false written answers were repeated as sworn oral testimony at a preliminary naturalization investigation, such statements constituted false testimony). The record clearly establishes that the respondent had the intent to deceive the asylum officer by making false oral statements for the purpose of obtaining asylum relief, a benefit under the Act. *See Kungys v. United States, supra; Bernal v. INS, supra.*

Other cases, however, may present more difficult questions of proof regarding what transpired at the interview. It may be necessary to present the testimony of the asylum officer before the Immigration Court, together with notes and other evidence of what was said under oath. In many cases, the Immigration Judge may find that there is insufficient evidence to establish that false testimony was presented. But, presuming that an oath was administered, the issue in such cases will be not whether the asylum applicant's statements were "testimony," but rather, whether they were "false." That question is not contested in this case.[8]

---

[8]We do not decide or intend to hold in this case that every instance of oral testimony under oath before an Immigration Judge, asylum officer, or other immigration officer, which is questioned or even disbelieved by that Judge or officer, necessarily constitutes "false testimony" that bars a finding of good moral character.

## V. CONCLUSION

False oral statements made under oath to an asylum officer for the purpose of obtaining an immigration benefit, i.e., asylum or withholding of deportation or removal, are made to a "court or tribunal" for purposes of Ninth Circuit case law and thus constitute "false testimony" for purposes of section 101(f)(6) of the Act. Accordingly, the respondent's appeal will be dismissed. Because there is no evidence in this case whether the admitted false statements to the asylum officer were made under oath, however, the record will be remanded for further proceedings to determine whether the respondent was under oath at the time he gave his false testimony.

**ORDER:** The appeal is dismissed.

**FURTHER ORDER:** The record is remanded to the Immigration Judge for further proceedings consistent with the foregoing opinion and the entry of a new decision.

Board Member Anthony C. Moscato did not participate in the decision in this case.

*CONCURRING AND DISSENTING OPINION:* Fred W. Vacca, Board Member, in which Paul W. Schmidt, Chairman; Michael J. Heilman, Gustavo D. Villageliu, Patricia A. Cole, and Lory D. Rosenberg, Board Members, joined

I respectfully concur in part and dissent in part.

I concur in the majority's conclusion that this case must be remanded to the Immigration Judge for a new decision. However, I believe that the proper interpretation of the law requires the Immigration Judge to consider substantially more than is indicated by the majority's opinion.

The majority finds that an interview before an asylum officer constitutes testimony before a "tribunal" and concludes that false statements made under oath before such a "tribunal" constitute "false testimony," precluding a finding of good moral character under section 101(f)(6) of the Immigration and Nationality Act, 8 U.S.C. § 1101(f)(6) (1994). I do not find either of these premises to be a correct reading of the statute or the law relating to "false testimony."

Consequently, I disagree with the majority's conclusion that, if the respondent's testimony before the asylum officer was provided under oath, he cannot establish good moral character, which is required to establish statutory eligibility for either suspension of deportation under section 244(a) of the Act, 8 U.S.C. § 1254(a) (1994), or voluntary departure under section 244(e) of the Act, 8 U.S.C. § 1254(e) (1994). Because false statements on an asylum application or before an asylum officer may be considered in the exercise of discretion, I conclude that the respondent's case

should be remanded for a determination by the Immigration Judge as to whether the respondent has established good moral character as a matter of discretion and is otherwise eligible for suspension of deportation or voluntary departure.

## I. "FALSE TESTIMONY" IN IMMIGRATION ADJUDICATIONS

The concept of "testimony" as used in section 101(f)(6) of the Act, which provides that "one who has given false testimony for the purpose of obtaining any benefits under this Act," is not as straightforward as the majority would make it out to be. As the Supreme Court stated in *Barber v. Gonzales*, 347 U.S. 637, 641 (1954), "While it is true that statutory language should be interpreted whenever possible according to common usage, some terms acquire a special technical meaning by a process of judicial construction." *See also Ippolito v. United States*, 223 F.2d 154, 157 (5th Cir. 1955) (concluding that "technical words are always interpreted in their technical sense unless this is inconsistent with a manifested different meaning"). Consequently, "the word testimony, technically construed, refers solely to the oral utterances of witnesses under oath, and in interpreting statutes, words having a technical meaning are to be so construed." *Sharaiha v. Hoy*, 169 F. Supp. 598, 601 (S.D. Cal. 1959) (citing *Barber v. Gonzales, supra*, at 641).[1]

In *Kungys v. United States*, 485 U.S. 759 (1988), the Supreme Court recognized that the term "testimony," as used in section 101(f)(6) of the Act, clearly was circumscribed in certain respects. The Court stated:

> First, "testimony" is limited to oral statements made under oath. The United States concedes that it does not include "other types of misrepresentations or concealments, such as falsified documents or statements not made under oath." Supplemental Brief for United States 3. *See, e.g., Sharaiha v. Hoy*, 169 F. Supp. 598, 601 (S.D. Cal. 1959); *Matter of Ngan,* 10 I&N Dec. 725, 726 (BIA 1964); *Matter of G-L-T-,* 8 I&N Dec. 403, 404-05 (BIA 1959); *see also Ensign v. Pennsylvania*, 227 U.S. 592, 599 . . . (1913). Second, § 1101(f)(6) applies to only those misrepresentations made with the subjective intent of obtaining immigration benefits.

*Id.* at 780. The Supreme Court's recognition of the limits that apply to determining what constitutes "testimony" is consistent with the decisions of the

---

[1] Furthermore, in the general context of judicial proceedings, "false testimony" refers to a highly specific form of recorded oral communication. Subsequent judicial decisions address the term "testimony" in the context of discussions regarding a verbatim record of oral statements made under oath. *Pillsbury Co. v. Conboy*, 459 U.S. 248 (1983); *Douglas Oil Co. of California v. Petrol Stops Northwest*, 441 U.S. 211, 213 n.1 (1979); *Chessman v. Teets*, 350 U.S. 3 (1955).

United States Court of Appeals for the Ninth Circuit in *Phinpathya v. INS*, 673 F.2d 1013, 1018-19 (9th Cir. 1981), *rev'd on other grounds*, 464 U.S. 183 (1984), and in *Bernal v. INS*, 154 F.3d 1020 (9th Cir. 1998).

In *Phinpathya v. INS, supra*, the Ninth Circuit ruled that "[t]he term testimony does not encompass all statements, *or even all statements made under oath.* Testimony means *a statement made* by a witness *under oath* for the purpose of establishing proof of a fact *to a court or tribunal*. It is distinguished from statements made under different circumstances, and from evidence derived from writings and other sources." *Id.* at 1018-19 (emphasis added) (citations omitted); *see also Matter of L-D-E-*, 8 I&N Dec. 399, 401 (BIA 1959) (citing *Sharaiha v. Hoy, supra*, and holding that false statements that appear in a written application, whether or not under oath, do not constitute testimony within the meaning of 8 U.S.C. § 1101(f)(6)). Subsequently, the Ninth Circuit in *Bernal v. INS, supra*, relying on the distinction it had made in *Phinpathya v. INS, supra*, ruled that false statements regarding marital status made under oath before a naturalization examiner, who was empowered by statute to conduct such examinations and render judgments based on the sworn testimony taken in such examinations, constituted false testimony. Thus, before concluding that every statement, or even every statement made under oath, constitutes "testimony," we must examine the pertinent section of the statute and any applicable regulations to determine whether the authority of the Immigration and Naturalization Service officer, as well as the nature and conduct of the adjudication, warrant classifying the adjudication as one occurring before a "tribunal."

The majority acknowledges that the Ninth Circuit, within whose jurisdiction this appeal arises, has not explicitly determined what type of deciding body constitutes a "tribunal." Although the majority cites a popular dictionary definition for the term "tribunal," the term is a technical one defined by legal authorities as "[t]he seat of a judge; a court of law; the place where he administers justice. The whole body of judges who compose a jurisdiction; a judicial court; the jurisdiction which the judges exercise." *Black's Law Dictionary* 1506 (6th ed. 1990). An "administrative tribunal" is defined as "[a] particular administrative agency before which a matter may be heard or tried as distinguished from a judicial forum." *Id.* at 46.

Moreover, although the majority cites *United States ex rel. Alaska Smokeless Coal Co. v. Lane*, 250 U.S. 549, 550 (1919), for the proposition that being empowered to approve applications somehow endows an entity with the status of a "tribunal," such a designation is inapposite to the issue at hand. That an adjudicator's function goes beyond "mere yielding to and registry of any demand" does not mean that he or she constitutes a tribunal, in the sense of a formal decision-making body. *Id.* at 550. Instead, the characterization of an adjudicator as a "tribunal" depends as much or more on the existence of "procedural safeguards, such as the right to counsel and a hearing before an impartial tribunal, *that are present when a court or an*

*agency adjudicates individual rights."* INS v. Chadha, 462 U.S. 919, 966 (1983) (emphasis added) (footnote omitted). In *INS v. Chadha, supra, the* Court emphasized that the exercise of quasi-judicial agency authority *"is subject to the procedural safeguards, including judicial review, provided by the Administrative Procedure Act."* Id. at 966 n.10 (citing *Buckley v. Valeo*, 424 U.S. 1, 140-41 (1976)). Because the absence of a formal hearing structure, the absence of a record, and the lack of access to judicial review in relation to interviews conducted before asylum officers are beyond dispute, the majority's conclusion that an asylum officer constitutes a "tribunal" is questionable.

## A. Statements Made Before Naturalization Examiners and Other Judicial Officers

The majority seeks to analogize the authority of asylum officers who conduct asylum interviews to that of naturalization officers who conduct naturalization examinations, citing *Bernal v. INS, supra*. In *Bernal*, however, the Service officer was a naturalization examiner, who not only was authorized by the statute to take sworn testimony in support of a naturalization application, but also conducted the interview in a formal and structured manner, using a "Q & A" format, recording each of the applicant's answers on the interview form and annotating the form in a different color ink. *Id.* at 1022-23; *see Matter of Ngan*, 10 I&N Dec. 725 (BIA 1964) (finding a visa applicant's false oral statements made under oath in a question-and-answer statement before a Service officer to constitute false testimony within the meaning of section 101(f)(6) of the Act).

In reaching its conclusion that the false statements made by the applicant constituted false testimony within the meaning of section 101(f)(6) of the Act, the court relied on the statute governing naturalization examinations. *Bernal v. INS, supra*, at 1022-23. The statute provides that a Service officer is authorized "to take testimony concerning any matter touching or in any way affecting the admissibility of any applicant for naturalization, [and] to administer oaths." Section 335(b) of the Act, 8 U.S.C. § 1446(b) (1994). Notably, the Attorney General has designated immigration examiners, and delegated authority to designate other officers, to conduct naturalization investigations, administer oaths, hold hearings, and conduct examinations. 8 C.F.R. § 332.1 (1996).

Any comparison of the role and function of a Service official designated as a naturalization examiner with that of an asylum officer must take into account the framework within which naturalization examinations are conducted, as well as the historic function of the naturalization examiner. The framework of such examinations is the naturalization process, which is essentially a judicial responsibility. *See United States v. Macintosh*, 283 U.S. 605, 613 (1931) (recognizing that under section 3 of the Naturalization Act, "jurisdiction to naturalize aliens is conferred upon the District Courts

of the United States and other enumerated courts of record. U.S.C. title 8, § 357"). The Supreme Court noted that "[a]s early as 1830, in *Spratt v. Spratt*, 4 Pet. 393, 407 . . ., Chief Justice Marshall, speaking for the court, said: 'The various acts upon the subject submit the decision on the right of aliens to admission as citizens to courts of record. They are to receive testimony, to compare it with the law, and to judge on both law and fact.' *United States v. Schwimmer,* 279 U.S. 644, 649, 73 L. Ed. 889, 49 S. Ct. 448." *Id.* at 617.

The examiner's function is "intended to be of assistance to the courts." *Petition of Cardines*, 366 F. Supp. 700, 708 (D. Guam 1973) (citing *Petition of De Leo*, 75 F. Supp. 896 (W.D. Pa. 1948)). As recognized in *Petition of De Leo, supra*, at 900, the Act "empowers the designated naturalization examiners to conduct preliminary examinations upon petitions for naturalization to any naturalization court and *to make recommendations* thereon to such court." *Petition of Cardines, supra*, at 708. Furthermore, in conjunction with the naturalization examiner's special relationship to the federal court, "such examiners are authorized to take testimony concerning any matter touching or in any way affecting the admissibility of any petitioner for naturalization." *Id.; see also United States v. Best*, 73 F. Supp. 654 (D. Mass. 1947).

If the case before us fell squarely within the terms of the situation addressed by the Ninth Circuit in *Bernal v. INS, supra*, I would not necessarily disagree with the majority's conclusion that the statements made under oath in an asylum interview constitute testimony before a tribunal. However, the distinction between the statutory delegation of authority to take testimony that is extended to naturalization examiners and the absence of any comparable delegation to asylum officers, discussed below, deserves specific emphasis, particularly in relation to the majority's reliance on *Bernal v. INS, supra*, as a basis to conclude that the statements made by an asylum applicant before an asylum officer constitute "testimony." In addition, the Board's treatment in *Matter of Ngan, supra*, of a false statement made before an immigration examiner as "testimony" was specifically limited to circumstances in which the statement was oral and not written, and in which the proceedings could be characterized as "quasi judicial" because "the respondent was placed under oath by an immigrant inspector and was examined in the presence of counsel." *Id.* at 729. Consequently, I do not find the statutory authority extended to naturalization examiners to be transferable to the asylum interview context, nor do I find the specific "Q & A" format relied upon in *Matter of Ngan, supra*, to reflect the character of an interview before an asylum officer, either generally or on the specific record before us.

### B. Statements Made Before an Asylum Officer

An interview before an asylum officer and the asylum officer's role and function in the course of that interview are governed solely by the specific provisions of the statute and regulations that relate to the adjudication of

asylum applications. It is these provisions to which we must look to determine whether statements made under oath before an asylum officer constitute "testimony."

Congress has not designated either the position of "asylum officer" or the full scope of authority to be exercised by an individual that the Attorney General has assigned to act as an "asylum officer." An asylum officer's authority derives principally from the Attorney General's authorization to "establish a procedure" for an alien in the United States to seek asylum. Section 208(a) of the Act, 8 U.S.C. § 1158(a) (Supp. II 1996). An asylum officer, i.e., an officer of the Office of Refugees, Asylum, and Parole, is authorized according to the authority delegated to the Attorney General to "conduct the interview in a nonadversarial manner." 8 C.F.R. § 208.9(b) (1999). The asylum officer, in connection with his or her functions under the statute, is exclusively authorized by the Attorney General only to "administer oaths, verify the identity of the applicant . . ., verify the identity of any interpreter, present and receive evidence, and question the applicant and any witnesses." 8 C.F.R. § 208.9(c).

### 1. Restriction on Authority Under Section 235 of the Act

At no place in the statute or regulations are asylum officers delegated authority by Congress or the Attorney General to take "testimony." The majority's effort to bootstrap the regulatory designation of an asylum officer as an immigration officer, in order to impose a syllogism supporting the conclusion that the asylum officer has statutory authority to "take testimony" in an asylum interview, and therefore to construe the interview as a tribunal, is unavailing. First, the regulation cited by the majority says no more than that an asylum officer is an immigration officer, who is "authorized to exercise the powers and duties of such officer *as specified by the Act and* [the regulations]." 8 C.F.R. § 103.1(j) (1999) (emphasis added). Second, the current version of section 235(d) of the Act, 8 U.S.C. § 1225(d) (Supp. II 1996), to which the majority looks as the source of an asylum officer's purported authority to take testimony, is entitled "Authority Relating to Inspections." It states no more than that, in the course of investigatory, enforcement-related functions, certain immigration officers may administer oaths and take and consider evidence, and that such officers may subpoena "the attendance and testimony" of witnesses before immigration officers. Sections 235(d)(3), (4) of the Act.

Such subpoena authority is universally associated with investigatory functions. *United States v. Minker*, 350 U.S. 179 (1956), invoked by the majority in support of its position that any immigration officer has authority to call witnesses and take testimony, actually is inapposite to the issue before us. In that case, the Court stated that the "controlling issue . . . is whether this section empowers an immigration officer to subpoena a naturalized citizen who is the subject of an *investigation* by the Service, where *the purpose of the*

*investigation* is to determine if good cause exists for the institution of denaturalization proceedings . . . ." *Id.* at 181 (emphasis added). By contrast, the question before us is not whether an asylum officer has subpoena authority that extends to pre-enforcement investigations or credible fear determinations under former section 235 of the Act, but whether section 235(d) of the Act and 8 C.F.R. § 103.1(j) (including an asylum officer as one of over 30 categories of employees designated as immigration officers) confer on an asylum officer the authority to subpoena witnesses to provide testimony in other contexts. *Cf.* 8 C.F.R. § 208.9; 8 C.F.R. 208.30 (1999).[2]

Furthermore, the Ninth Circuit also recognizes both the preference for limited subpoena authority and the enforcement-oriented purpose of section 235 of the Act, ruling in *Lee Tin Mew v. Jones*, 268 F.2d 376, 379 (1959), that the Government failed to establish the immigration officer's authority to issue the administrative subpoena and stating the following:

> The warrant issued . . . does not recite that the officer is carrying on an inspection of any alien seeking "admission or readmission to or the privilege of passing through the United States" . . . [nor that the alien] is a "person coming into the United States" who may be required under the enactment to "state under oath" certain matters . . . [nor that] the purpose of the subpoena is to take evidence "touching the privilege of any alien or person he believes or suspects to be an alien to enter, reenter, pass through or reside in the United States." . . . *The whole section seems to be geared to the examination of the qualifications of a person arriving at the border* to enter the country and reside therein.

*Id.* at 379 (emphasis added).[3]

Section 235 of the Act relates to inspection and admission of aliens, not

---

[2]In *Cudahy Packing Co. of Louisiana v. Holland*, 315 U.S. 357, 363 (1942), the Supreme Court emphasized that the "[u]nlimited authority of an administrative officer to delegate the exercise of the subpoena power is not lightly to be inferred. It is a power capable of oppressive use, especially when it may be indiscriminately delegated and the subpoena is not returnable before a judicial officer." *See also Peters v. United States*, 853 F.2d 692, 694 (9th Cir. 1988). According to *United States v. Minker, supra*, at 187, such "extensive delegated authority reinforces the considerations inherent in the nature of the power sought to be exercised that make for a restrictive reading of the Janus-faced word 'witness.'" The Court found that "[t]hese concerns, relevant to the construction of this ambiguously worded power . . . may result in loss of both property and life; or of all that makes life worth living. *Ng Fung Ho v. White*, 259 U.S. 276, 284 [(1922)]." *Id.* (citations omitted). And, despite the majority's contention that the Court's holding in *Minker* has not been extended to subpoenas involving aliens or citizens who are not themselves the target of the investigation, it is notable that the principle cited by the Court in *Ng Fung Ho v. White, supra*, has been invoked repeatedly by the federal courts in affirming the due process rights of aliens.

[3]Similarly, in *Sherman v. Hamilton*, 295 F.2d 516 (1st Cir. 1961), *cert. denied*, 369 U.S. 820 (1962), which is cited by the majority, the court concluded only that an authorized immigration officer may administratively subpoena an alien who is himself the subject of the investigation when it precedes a deportation or exclusion hearing. *Id.* at 519-20 (citing section 236 of the Act for the proposition that "Congress has expressly authorized immigration officers to require aliens to testify in administrative hearings as to their right to remain in this country").

to substantive claims for asylum, which are distinguished from the question of admissibility and are determined "irrespective of such alien's status." *See* sections 208(a), 235(b)(1)(A)(ii) of the Act. Notably, in pertinent part omitted by the majority, former section 235 of the Act, which was addressed in *United States v. Minker, supra*, provides that "'[a]ll aliens arriving at ports of the United States shall be examined by one or more immigration officers *at the discretion of the Attorney General and under such regulations as he may prescribe*.'" *Id.* at 180 n.1 (quoting section 235(a) of the Act). This is consistent with the terms of section 101(a)(18) of the Act, which defines "immigration officer" broadly to include "any employee . . . of the Service or of the United States *designated* by the Attorney General, individually or by regulation, *to perform the functions of an immigration officer*." (Emphasis added.) The regulations set forth at 8 C.F.R. § 103.1(j), which must be read in the context of section 101(a)(18) of the Act, 8 U.S.C. § 1101(a)(18) (1994), regarding performance of the *functions* of an immigration officer, contains an equally broad listing of over 30 categories of employees who are designated as immigration officers.

Asylum officers do not exercise subpoena authority in the context of asylum interviews under either section 208 of the Act or 8 C.F.R. pt. 208. Neither do asylum officers carry out pre-enforcement investigative functions in the context of conducting asylum interviews under those sections. *Cf.* section 235(b)(1)(A)(ii) of the Act; section 208(a) of the Act. The recent amendment to the statute, including asylum officers in the inspection and admission process under section 235 of the Act, did not exist in the statute prior to September 30, 1996, and no such investigatory authority to take testimony was extended, even for that limited purpose, when this respondent was interviewed by an asylum officer. Certainly, it cannot be claimed that by virtue of the authority in section 235 of the Act and 8 C.F.R. § 103.1(j) alone, asylum officers are designated to perform the functions of a chief patrol agent or district director to issue subpoenas under 8 C.F.R. § 287.4 (1999). Significantly, other than supervisory asylum officers, asylum officers are not authorized to perform the functions of many other immigration officers "acting in such capacity [of one performing an inspection to determine admissibility]" to issue notices to appear under 8 C.F.R. § 239.1(a) (1999). Furthermore, I doubt that the majority would contend that an aircraft pilot, helicopter pilot, detention guard, contact representative, legalization assistant, fingerprint specialist, or immigration information officer, each of whom is listed along with the position of asylum officer under 8 C.F.R. § 103.1(j) as an immigration officer, is an officer to whom the authority to subpoena and take testimony automatically extends.

The Supreme Court's reference in *United States v. Minker, supra*, at 185, to the "full range of subjects covered by the statute" and the significance of individual section headings, seized upon by the majority as justification for its position that *Minker* authorizes asylum officers to take testi-

mony, was made 40 years before the respondent appeared before the Immigration Judge, nearly 30 years before an Asylum Office was established, and 40 years before asylum officers were included in the inspection procedure under section 235 of the Act. Obviously, the Court's interpretation of the language of former section 235 of the Act, which only recently has been modified to include asylum officers for a limited purpose, relied only on section 101(a)(18) of the Act, and was not informed by 8 C.F.R. § 103.1(j), which was first promulgated in 1975. *See id.* Consequently, in the context of section 235(b) of the Act, an asylum officer's authority to take testimony should depend on the designation of the Attorney General in pertinent regulations.

An asylum officer's power to subpoena and take testimony, set forth in section 235 of the Act, has been refined by regulations in which the Attorney General specifically designated the role of asylum officers in conducting credible fear determinations that are made in the course of the inspection process. *See* 8 C.F.R. §§ 208.30, 235.3(b)(4) (1999). Interestingly, the Attorney General has indicated her intent to limit the asylum officer's authority in this context to administering oaths, verifying the identity of the applicant and any interpreter, presenting and receiving evidence, and questioning the applicant and any witnesses. *See* 8 C.F.R. § 208.9(c) (referring to the authority contained in 8 C.F.R. § 208.30. No subpoena authority or power to take testimony is extended to asylum officers by the Attorney General in this or any other regulation, creating a stark inconsistency when compared to the position taken by the majority. Furthermore, even assuming that notwithstanding the limitations in 8 C.F.R. §§ 208.9 and 208.30, the statute controls the authority extended to all immigration officers who participate in the inspection and admission process, such investigatory authority to issue subpoenas or take testimony exists only in the context of the asylum officer's role in an inspection and admission function, and no more.

### 2. Authority In an Asylum Interview

In addition, in 1995, the Attorney General amended the regulations and comprehensively restricted the asylum officers' authority over asylum applications. With the limited exception of nonimmigrants who are presently in a lawful status, an asylum officer has been divested of authority to deny an application for asylum and reduced merely to screening and *granting* all applications in which the applicant is subject to removal, or referring the applicant's case to an Immigration Judge for an exclusion or deportation hearing. *Compare* 8 C.F.R. § 208.14(b)(2) (1995) *with* 8 C.F.R. § 208.14(a) (1994). As the preamble to the 1995 regulations specifically states, "Asylum officers would no longer deny applications from persons who are excludable or deportable, but instead would refer such cases directly to an immi-

gration judge for adjudication." 59 Fed. Reg. 62,284, 62,294 (1994) (to be codified at 8 C.F.R. pt. 208). The amendment of the regulations effectively removed the two principal functions—preparing a written assessment of the claim and rendering a written decision—that would require, or at least provide an impetus for, in the majority of asylum interviews, an asylum officer to keep an accurate and reliable record of the applicant's statements during the interview. *See* 8 C.F.R. § 208.18(c) (1994).

Furthermore, the majority's contentions that an asylum officer has "analogous authority over asylum claims" as the authority exercised by an Immigration Judge, and specifically, that an asylum officer has authority to "maintain a record" or "most importantly, to decide the merits of the asylum application" are blatantly incorrect. *See Matter of R-S-J-,* 22 I&N Dec. 3401, at 8 (BIA 1999). First, unlike an Immigration Judge, an asylum officer does not conduct a "hearing," and unlike an asylum application adjudicated in a hearing conducted before an Immigration Judge, there is no judicial review of the content or result of an asylum interview. Second, in stark contrast to the "interview" conducted by an asylum officer, the regulations mandate that in proceedings before an Immigration Judge, "[t]estimony of witnesses appearing at the hearing shall be under oath or affirmation." 8 C.F.R. § 3.34 (1999). "The only recording equipment permitted in the proceeding will be the equipment used by the Immigration Judge to create the official record." 8 C.F.R. § 3.28 (1999). Third, recent amendments to the regulations have circumscribed the authority of asylum officers.

As noted, with the exception of applications filed by nonimmigrants who presently are in a lawful status, asylum officers no longer have any authority to deny asylum. 8 C.F.R. 208.14(b) (1999). Consequently, the majority is in error when it contends that asylum officers exercise greater authority than naturalization examiners, because the former grant or deny, while, in the majority of cases, the latter only recommend a course of action. To say that an asylum officer's authority is comparable to that of an Immigration Judge, or that she has greater authority than a naturalization examiner, is utterly without support. Moreover, an asylum officer's authority certainly cannot be said to be "at least as firmly established," having been restricted just 3 years ago. *Matter of R-S-J-, supra*, at 10.

Significantly, in the vast majority of cases, asylum officers no longer are responsible for preparing and issuing a written "Notice of Intent to Deny," and no longer are responsible for issuing a written decision addressing either an applicant's veracity or credibility or the merits of his or her claim. When an asylum officer is unable to grant asylum based on the application and the interview, the asylum officer must refer the applicant for a full hearing before an Immigration Judge, at which the applicant may submit an asylum application anew that will be adjudicated on the record. 8 C.F.R. § 208.14(b)(2). The asylum officer keeps no record, makes no rec-

ommendation for purposes of a hearing before the Immigration Judge, and enters no substantive adverse decision as a result of the interview conducted. Yet it is the interview underlying such a referral to the Immigration Judge to which the majority would look to conclude that the statements made by an asylum applicant constitute "false testimony."

The informal, nonadversarial procedures followed by asylum officers severely limit the reliability of any statements later alleged to have been made by an asylum applicant during his interview with an asylum officer. Interviews before asylum officers are not conducted in the more formal and structured "Q & A" format that is typical of naturalization examinations, or other highly structured interview situations, which often include a specific recording of the alien's statements. *See, e.g., Stokes v. INS*, No. 74 Civ. 1022 (S.D.N.Y. Nov. 10, 1976) (final judgment) (requiring the Service to conduct visa petition interviews based on a marriage in a recorded question and answer format). In such cases, the question whether or not "false testimony" may have been presented is not dependent on the vagaries of recollection and subjective interpretation. By contrast, an interview before an asylum officer contains neither the formality nor the detail produced by a formal "Q & A" or recorded hearing. Consequently, not only are the assurances of accuracy and reliability that are present in more structured cases absent, but we are not presented with any tangible record to review.

This is a crucial distinction. In *Matter of S-S-,* 21 I&N Dec. 121 (BIA 1995), we held that in order for the Board to fully and fairly consider the effect of a decision by an asylum officer on a later application before an Immigration Judge, the record of the interview must contain a meaningful, clear, and reliable summary of the statements made by the applicant. In the alternative, we recognized that a record of the interview might be preserved in a handwritten account of the specific questions asked of the applicant and his specific responses, or through transcription of an electronic recording, rejecting the "obviously . . . informal, personal notations of the asylum officer that were never intended to be a formal summary of the interview." *Id.* at 123. This is so because, while they were made at the time of the respondent's interview, such notes were "randomly organized, cryptic to all but the note-taker, and partially illegible." *Id.* The majority's concession that determining whether an alien has given "false testimony" before an asylum officer "may present more difficult questions of proof" is telling and raises practical concerns that belie its insistence that we establish a rule that statements before asylum officers constitute "false testimony." *Matter of R-S-J-, supra*, at 12.

Under circumstances in which there is no record of the interview, and the interviewer lacks any authority to deny the claim, I do not see how we can determine whether the statements were in fact "false testimony," even if they were made under oath and even if the respondent admits that he affirmed false statements made in his asylum application. I note, in addi-

tion, that the Third Circuit has questioned even the reliability of record "Q & A" statements. *See Marincas v. Lewis*, 92 F.3d 195 (3d Cir. 1996) (finding reliance on such records to establish an alien's incredibility to be inappropriate); *see also Balasubramanrim v. INS*, 143 F.3d 157 (3d Cir. 1998) (finding reliance on statements given to airport inspectors not dispositive). In the instant case, there is even less of a record upon which to judge whether the respondent made any false statements during the asylum interview. Nevertheless, the majority not only would make an adverse credibility finding and conclude that the respondent lacks good moral character as a matter of fact, but would bar the respondent from showing good moral character as a matter of law. This goes much further than the law or this record allows.

Every false statement made under oath does not necessarily constitute false testimony that is punishable under the law. As the Ninth Circuit emphasized in *Phinpathya v. INS, supra*, at 1019, "Had Congress intended sections 1101(f)(6) and 1254(a)(1) to encompass all statements, or even all statements under oath, it would have so provided," citing the explicit provision in 18 U.S.C. § 1001 that punishes the making or use of any "false, fictitious or fraudulent statements or representations, or . . . any false writing or document." The court reasoned:

> By limiting sections 1101(f)(6) and 1254(a)(1) to "false testimony," Congress deliberately provided that only a narrow class of statements and representations would constitute conclusive proof of lack of good moral character. The drastic consequences of the statute, which renders an alien who has given false testimony automatically ineligible for suspension of deportation, provides further support for a narrow interpretation of "false testimony."

*Id.*

The limitations on what types of statements constitute false testimony encompass both the forum in which the statements are made and the format in which they are reported. For example, a material false statement—oral or written—to an executive branch agency regarding a matter within its jurisdiction is punishable as a criminal offense. 18 U.S.C. § 1001 (Supp. II 1996). However, this must be distinguished from a false statement to a judicial branch adjudicator, before whom such a false statement is not punishable under 18 U.S.C. § 1001. *See Hubbard v. United States*, 514 U.S. 695 (1995). The criminal code explicitly sets forth the crime of making false statements to a naturalization officer. 18 U.S.C. § 1015 (1994 & Supp. II 1996). Of even greater contrast is the requirement that testimony before a tribunal be established to be false to constitute perjury under 18 U.S.C. § 1621 (1994).

Similarly, to the extent pertinent here, the Jencks Act, 18 U.S.C. § 3500(b) (1994), requires the Government, on the defendant's motion, to produce any "statement" of a "witness called by the United States." The

term "statement" is defined in the Jencks Act as the witness's signed or adopted written statement, a "substantially verbatim" recording or transcription of the witness's oral statement, or any testimony the witness has given to a grand jury. 18 U.S.C. § 3500(e); *see also United States v. Sasso*, 59 F.3d 341, 351 (2d Cir. 1995); *United States v. Ben M. Hogan Co.,* 769 F.2d 1293, 1300-01 (8th Cir. 1985) (prosecutor's witness interview notes containing fragmentary quotes not "statements" covered in their entirety by the Jencks Act). This is pertinent because the Jencks Act distinguishes between types of statements, all of which must have the ring of reliability to them. It is clear from the foregoing provisions that Congress makes a distinction between testimony and other forms of evidence. *See also* Fed. R. Crim. P. 26; Fed. R. Civ. P. 43(a); Fed. R. Evid. 602, 603, 613.

Such distinctions are consistent with the conclusions reached by the Ninth Circuit in the immigration context. The court in *Phinpathya v. INS*, *supra*, at 1018-19, referring to a deportation hearing conducted on the record before an Immigration Judge, held that because the petitioner's false statements were written on her application for suspension of deportation, they were not statements made in that hearing by a witness under oath to establish proof of a fact to a court or tribunal and did not qualify as false testimony. As in *Phinpathya*, where the court emphasized that the record was unclear as to whether the respondent affirmed the statements made on her application, the transcript before us reflects only that the respondent agreed that he "went accordingly" with the application his attorney had prepared. Contrary to the majority's reading, the respondent does not admit that he actually made statements under oath before the asylum officer in which he lied or even repeated the false information in the application. While he admitted that when he signed the application before the asylum officer he knew the information on the application was false, the respondent acknowledged only equivocally that he answered "according to the story." This does not establish that "[t]he same false statements, however, were given orally as testimony at the preliminary investigation, and this brings the case clearly within the proscription of the statute. *See Matter of G-L-T-,* 8 I&N 403 (1959)." *In re Haniatakis*, 376 F.2d 728, 730 (3d Cir. 1967).

In light of the authorities discussed above, and the state of the record before us, I conclude that whether or not the asylum officer placed the respondent under oath, false statements made before an officer who is not expressly authorized by Congress to take testimony and who does not create a record cannot be deemed "false testimony" precluding the respondent from an opportunity to demonstrate that a discretionary finding of good moral character under section 101(f)(6) of the Act is warranted.

This is not to say that the asylum officer did not diligently undertake his or her duties. The annotations on the asylum application constitute the asylum officer's recollections and impressions of the alien's statements, not the alien's actual statements, and the respondent has acknowledged that his

former attorney specifically included false and inaccurate information on his written application. The critical fact is that this is only an application, and it does not constitute testimony. Although it is a false application and a false statement, it is not "false testimony." I cannot in good conscience impose upon an alien the stigma of "false testimony," barring any showing of good moral character pursuant to section 101(f)(6) of the Act, under these circumstances. The record is simply not specific and detailed enough to support that conclusion, and the statutory authority designated to an asylum officer does not warrant such a conclusion. Accordingly, I would hold that false statements made on an application before an asylum officer do not constitute "false testimony."

## II. GOOD MORAL CHARACTER IN THE EXERCISE OF DISCRETION

The issue of whether the respondent has established good moral character is a matter of discretion that must be determined in the first instance by the Immigration Judge. I do not need to reach and express no opinion as to whether the exercise of discretion is warranted in this case. I note, however, that whether discretionary relief is warranted requires an examination and a balancing of favorable and adverse factors. *See Matter of Gamboa*, 14 I&N Dec. 244, 248 (BIA 1972) (holding that in exercising discretion on a voluntary departure application, the special inquiry officer may take into account many factors, including the alien's prior immigration history, the nature of his entry or entries, and compensating elements such as long residence, close family ties, or humanitarian needs); *see also Matter of S-,* 6 I&N Dec. 692 (A.G. 1955). To be considered fair and reasonable, a decision based on the exercise of discretion must contain "'reasons which show that it has properly considered the facts which bear on its decision.'" *Prapavat v. INS,* 662 F.2d 561, 562 (9th Cir. 1981) (quoting *Mejia-Carrillo v. INS*, 656 F.2d 520, 522 (9th Cir. 1981)).

When the Board denies relief as a matter of discretion, it may not exercise its discretion arbitrarily. *Mattis v. INS*, 774 F.2d 965, 968 (9th Cir. 1985) (citing *Patel v. INS*, 741 F.2d 1134, 1136 (9th Cir. 1984)); *see also Watkins v. INS*, 63 F.3d 844, 850 (9th Cir. 1995) (reaffirming that "'[w]hile agencies must have significant flexibility to adapt their practices to meet changed circumstances or the facts of a particular case . . . [they] abuse their discretion no less by arriving at plausible decisions in an arbitrary fashion than by reaching unreasonable results'" (quoting *Yepes-Prado v. INS*, 10 F.3d 1363, 1370 (9th Cir. 1993))); *Batoon v. INS*, 791 F.2d 681, 684 (9th Cir. 1986) (en banc) (upholding review for abuse of discretion). For almost 2 decades, the Ninth Circuit has made clear that discretionary denials must show that the Board, and the Immigration Judges, weighed both favorable

and unfavorable factors. *De La Luz v. INS*, 713 F.2d 545, 546 (9th Cir. 1983); *see also Ahwazi v. INS*, 751 F.2d 1120, 1122-23 (9th Cir. 1985) (emphasizing that the Board must state its reasons and show proper consideration of all factors when weighing equities and denying relief); *Contreras-Buenfil v. INS*, 712 F.2d 401, 403 (9th Cir. 1983); *Ramirez-Gonzalez v. INS,* 695 F.2d 1208, 1213 (9th Cir. 1983); *Chae Kim Ro v. INS,* 670 F.2d 114, 116 (9th Cir. 1982); *Villena v. INS*, 622 F.2d 1352, 1361 n.12 (9th Cir. 1980). Accordingly, the Board has consistently required that *all* relevant factors must be considered individually and cumulatively. *Matter of O-J-O-,* 21 I&N Dec. 381 (BIA 1996); *Matter of Anderson*, 16 I&N Dec. 596 (BIA 1978); *Matter of Riccio*, 15 I&N Dec. 548 (BIA 1976).

Although we need not weigh or balance here any of the positive and adverse factors that must be considered individually or cumulatively, I do note that the record contains evidence that the respondent has been in the United States since 1983, a period of 15 years, that he is 45 years of age, and that he has worked in a stable position at Barrier Oil Company for the past 10 years, starting as a service representative and moving up to the position of service station supervisor. The record also indicates that the respondent suffered a heart attack in 1995, and that he has been taking medication for a heart condition and has suffered additional heart problems requiring hospitalization since that time. The record also contains information that the respondent is a member of a religious group in the United States and has formed meaningful religious and personal ties to that group and its members. In addition, the respondent has documented the adverse conditions in the Punjab, the region of India to which, as a Sikh, he would return.

In addition, the record contains affirmative evidence indicating that the respondent has no criminal record and has not been involved in any criminal activity in the United States, and it contains no information that the respondent ever has sought or received any federal or state public assistance for which he was not eligible. The record contains no information indicating that the respondent has any previous record of immigration violations of any sort. At the same time, the record does contain information that the respondent affirmed false representations made in an asylum application, and that he may have made further statements in the asylum interview that perpetuated the falsehoods contained in the application. The determination whether the respondent has demonstrated good moral character, for purposes of establishing his eligibility to apply and be considered for both suspension of deportation and voluntary departure, must rest on a consideration of all the factors in the record. *Arrozal v. INS*, 159 F.3d 429, 432-33 (9th Cir. 1998).

The initial determination as to whether the respondent has established good moral character is not before us, but is for the Immigration Judge. Therefore, without deciding the burden of proof and discretionary questions raised, regarding either the respondent's good moral character alone or his

ultimate eligibility for suspension of deportation, I would remand this appeal to the Immigration Judge for all purposes. The respondent is entitled to a hearing in which the Immigration Judge assesses the evidentiary factors pertaining to good moral character and makes a legal determination concerning the respondent's eligibility to apply for suspension of deportation in that regard, as well as in terms of whether the respondent can demonstrate extreme hardship and merits suspension of deportation in the overall exercise of discretion.

## III. CONCLUSION

I conclude that, as a matter of law, statements provided in the asylum interview cannot constitute the basis for a "false testimony" finding. While the majority would remand this case to the Immigration Judge to determine whether the respondent testified under oath during the interview before the asylum officer, I do not view that determination dispositive, as I conclude that even false statements made under oath before the asylum officer do not constitute false testimony within the meaning of section 101(f)(6) of the Act. Rather, in light of my conclusion that the respondent is not statutorily barred from demonstrating good moral character, the case should be remanded to allow the Immigration Judge to consider both favorable and adverse factors bearing on whether the respondent has demonstrated good moral character and other eligibility for discretionary relief.