Niyom PHINPATHYA and Padungsri
Phinpathya, Petitioners,

v.

IMMIGRATION AND NATURALIZA-
TION SERVICE, Respondent

No. 80-7454.

United States Court of Appeals,
Ninth Circuit.

Argued and Submitted May 6, 1981.

Decided Oct. 1, 1981.

As Amended on Denial of Rehearing and
Rehearing En Banc April 5, 1982.

Michael D. Ullman, Beverly Hills, Cal., for petitioners.

Peter R. Osinoff, Asst. U.S. Atty., Los Angeles, Cal., for respondent.

Before CANBY, REINHARDT, Circuit Judges, and PFAELZER *, District Judge.

REINHARDT, Circuit Judge.

Petitioners appeal the denials of their applications for suspension of deportation. We reverse.

Petitioners, husband and wife, are natives and citizens of Thailand who first entered the United States as nonimmigrant students. Mr. Phinpathya entered in August, 1968 and Mrs. Phinpathya in October, 1969. They were authorized to remain in the United States until July, 1971, but they remained beyond that date without permission. In 1974, Mrs. Phinpathya visited her sick mother in Thailand for three months; she reentered the United States as the spouse of a nonimmigrant student.

* Honorable Marianna Pfaelzer, United States District Judge for the Central District of California, sitting by designation.

Deportation proceedings commenced in January, 1977. Orders to Show Cause were issued charging petitioners with deportability under 8 U.S.C. § 1251(a)(2) as nonimmigrants who had remained beyond the time authorized. At the deportation hearing, petitioners admitted deportability and applied for suspension of deportation under 8 U.S.C. § 1254(a)(1). The immigration judge granted Mr. Phinpathya's application, but denied Mrs. Phinpathya's application. The immigration judge found Mrs. Phinpathya to be statutorily ineligible for suspension of deportation on the ground that she had not satisfied the seven years continuous physical presence requirement of section 1254(a)(1). Mrs. Phinpathya was given voluntary departure.

The immigration judge's rulings were appealed to the Board of Immigration Appeals (BIA). The BIA reversed as to Mr. Phinpathya on the ground that he failed to meet the extreme hardship requirement of section 1254(a)(1). The BIA affirmed as to Mrs. Phinpathya on the grounds that (1) she failed to meet the continuous physical presence requirement of section 1254(a)(1), and (2) she failed to meet the good moral character requirement of section 1254(a)(1).

Section 1254(a)(1) empowers the Attorney General, in his discretion, to suspend deportation.[1] To be eligible for this discretionary suspension of deportation, however, an alien must show: (1) continuous physical presence in the United States for the seven years immediately preceding his application for suspension of deportation, (2) good moral character for these seven years, and (3) extreme hardship to himself or to his spouse, parent or child who is an American citizen or a lawful permanent resident. 8 U.S.C. § 1254(a)(1). The issue in the case before us is whether the BIA erred in its determination that neither Mr. nor Mrs. Phinpathya was eligible for suspension of deportation.

1. For the purpose of § 1254(a)(1), the Immigration and Naturalization Service acts as a delegate for the Attorney General.

A. *Mr. Phinpathya*

The BIA denied Mr. Phinpathya's application for suspension of deportation on the ground that he did not prove extreme hardship.[2] We must decide whether the BIA abused its discretion in its finding that Mr. Phinpathya would not suffer extreme hardship if deported. *See INS v. Wang*, 450 U.S. 139, 101 S.Ct. 1027, 67 L.Ed.2d 123 (1981) (per curiam).

In *Wang*, the Supreme Court stated that the Immigration and Naturalization Act commits the determination of extreme hardship "in the first instance to the Attorney General and his delegates, and [that] construction and application of [the extreme hardship] standard should not be overturned by a reviewing court simply because it may prefer another interpretation of the statute." 101 S.Ct. at 1031. We proceed in our review of the decision of the BIA, therefore, mindful of the limited nature of our function.

█ This is not the usual case in which the parents of an American citizen child are to be deported. *Cf. Wang*, 101 S.Ct. at 1031. Here, the Phinpathyas have a young daughter, Nissa, who was born in the United States and is an American citizen. What distinguishes this case, however, is the fact that Nissa has epilepsy. She regularly suffers from convulsive attacks. Nissa's epilepsy, although controlled, requires constant medical attention. She has a personal physician whom she visits weekly. She takes anti-convulsive medicine on a daily basis. Without constant medical attention and medication, Nissa's life would be endangered.

The BIA, in making its determination, considered both the hardship to Mr. Phinpathya and to Nissa.[3] It found no extreme hardship because there was insufficient evidence on the record that Nissa would receive inadequate medical care in Thailand. Following the mandate of the Supreme Court, we do not question this finding on the basis of our own view of what constitutes extreme hardship.

We do, however, question the finding relating to Nissa on a different ground. The BIA proceeded on the assumption that when evidence of a serious medical problem is presented, a finding of extreme hardship cannot be made unless there is a factual showing of inadequate medical care in the country to which the alien will be deported. It then based its hardship determination on the fact that there was no proof offered that medical care for epileptics was inadequate in Thailand.

While the absence of proof of inadequate medical care may in some cases be dispositive of extreme hardship claims based on medical problems, it is not the exclusive factor to be considered in all such cases. In this case, the BIA did not consider, for example, whether the mere removal, and uprooting, of an epileptic child, wholly apart from the question of comparative medical care, constitutes extreme hardship. The effects on an epileptic child of a long trip and of being placed in a wholly different environment are factors that, at the least, bear on a hardship determination and should have been considered by the BIA. None of the reasons asserted by the BIA reflects consideration of those factors, although there is evidence in the record relating to them.

█ A failure to consider factors relevant to the determination of hardship is an abuse of discretion. *Santana-Figueroa v. INS*, 644 F.2d 1354, 1356 n.5 (9th Cir. 1981); *see Carnalla-Munoz v. INS*, 627 F.2d 1004, 1006 (9th Cir. 1980). Thus, the BIA's failure to consider the factors involved in uprooting an epileptic child from her commu-

---

**2.** The BIA held that Mr. Phinpathya satisfied the seven years continuous physical presence and the good moral character requirements of § 1254(a)(1)

**3.** 8 U.S.C. § 1254(a)(1) requires that one eligible for suspension of deportation be "a person whose deportation would .. result in extreme hardship to ... his ... child, who is a citizen of the United States ..." Thus, extreme hardship to Nissa is imputed, under this statutory provision, to Mr. Phinpathya. Mr. Phinpathya's extreme hardship, therefore, would be derivative.

nity and moving her to Thailand constitutes an abuse of discretion. Accordingly, the order of the BIA as to Mr. Phinpathya is reversed and remanded for reconsideration of the question of extreme hardship.

B. *Mrs. Phinpathya*

▮ The basic principles to be applied in determining whether an alien's departure is "meaningfully interruptive" of the seven years continuous presence requirement of section 1254(a)(1) were recently set forth by this court in *Kamheangpatiyooth v. INS*, 597 F.2d 1253 (9th Cir. 1979).[4] The court stated:

> To effectuate the purposes underlying the continuous period requirement, and to realize Congress's desire (identified in [*Rosenberg v.*] *Fleuti* [, 374 U.S. 449, 83 S.Ct. 1804, 10 L.Ed.2d 1000 (1963)]) to avoid exposing aliens to unexpected risks and unintended consequences, the Board must determine whether a particular absence during the seven-year period reduced the significance of the whole period as reflective of the hardship and unexpectedness of expulsion.

*Id.* at 1257. Thus, when deciding whether an absence is "meaningfully interruptive" we must be mindful of what we identified in *Kamheangpatiyooth* as the Congressional purpose underlying the seven years continuous presence requirement:

> It was Congress's judgment that presence of that length was likely to give rise to a sufficient commitment to this society through establishment of roots and development of plans and expectations for the future to justify an examination by the Attorney General of the circumstances of the particular case to determine whether deportation would be unduly harsh .... Presence that is only intermittent suggests the alien has not become so at-

tached to this country that the authorities should consider suspending normal operation of the immigration laws on his behalf.

*Id.* at 1256.

▮ Three factors that are helpful in determining whether a departure is "meaningfully interruptive" are: (1) the length of the absence, (2) the reason for the absence, and (3) the necessity of travel documents. *de Gallardo v. INS*, 624 F.2d 85, 87 (9th Cir. 1980); *Kamheangpatiyooth*, 597 F.2d at 1257. These three factors, however, are "only evidentiary" as to whether an absence breaks the continuity of seven years presence. *Kamheangpatiyooth*, 597 F.2d at 1257. "To treat them as if they were in themselves the object of the inquiry may defeat the objectives of the statute." *Id.* at 1257–1258. Thus, the proper application of the *Kamheangpatiyooth* test is to view the circumstances in their totality, and analyze those circumstances in light of the Congressional purpose underlying the continuity requirement. *Id.* at 1258; *see de Gallardo.*

▮ With the exception of her three month trip to Thailand in 1974 to visit her sick mother, Mrs. Phinpathya was physically present in the United States for the eight years immediately preceding her application for suspension of deportation. Although she travelled to Thailand with her two children, her husband remained in the United States during the absence, and she intended, at all times, to return to the United States.[5]

In concluding that Mrs. Phinpathya's trip to Thailand was "meaningfully interruptive," the BIA relied exclusively on its finding that "by her departure, she increased substantially the likelihood that her actual illegal status would be discovered" and that she thereby increased her risk of deporta-

---

**4.** These principles were reaffirmed in in *de Gallardo v. INS*, 624 F.2d 85, 86–87 (9th Cir. 1980).

**5.** The facts here are similar in significant respects to those in *Kamheangpatiyooth* and *de Gallardo*. In those cases, this court reversed and remanded orders of the BIA, which held that the alien's departure was "meaningfully interruptive" of the seven year period. In

*Kamheangpatiyooth*, the alien, a native and citizen of Thailand, left the United States for one month to visit his sick mother in Thailand; the alien intended, at all times, to return to the United States. In *de Gallardo*, the alien took a three and one-half month vacation in Mexico and Honduras.

tion. Although the BIA purported to apply the *Kamheangpatiyooth* test, it misinterpreted the basic thrust of that test and repeated the same error it had made in that case. In *Kamheangpatiyooth*, the immigration judge "fixed his attention directly on the duration of the absence, its purpose, and whether travel documents were obtained." 597 F.2d at 1257. This court reversed on the ground that it is error to treat isolated factors as determinative of the question of whether an absence is "meaningfully interruptive." By relying exclusively on the fact that Mrs. Phinpathya increased her risk of deportation by her absence, the BIA treated that factors as "the object of the inquiry," and failed to view the circumstances in their totality and in light of the underlying Congressional purpose.

Moreover, the BIA misread *Kamheangpatiyooth* in an even more elementary manner. In *Kamheangpatiyooth*, the court held that an absence cannot be "meaningfully interruptive" if two factors are present: (1) the hardships would be as severe if the absence had not occurred, and (2) there would not be an increase in the risk of deportation as a result of the absence. *Id.*[6] The court did *not* hold, however, as the BIA seems to believe, that an absence is, *ipso facto*, "meaningfully interruptive" if one, or even both, of those factors is not present, and it did *not* hold that an increase in the risk of deportation necessarily renders an absence "meaningfully interruptive." In relying exclusively on the increase in the risk of deportation as the basis for concluding that Mrs. Phinpathya's absence was "meaningfully interruptive," the BIA clearly misread the *Kamheangpatiyooth* discussion of that issue.

6. The court wrote:
 An absence cannot be significant or meaningfully interruptive of the whole period if indications are that the hardship of deportation to the alien would be equally severe had the absence not occurred, and that no significant increase in the likelihood of deportation could reasonably have been expected to flow from the manner and circumstances surrounding the absence.
 *Kamheangpatiyooth*, 597 F.2d at 1257.

7. The Service also asserts that Mrs. Phinpathya "knowingly lied" to the American Consulate in Bangkok, in order to obtain a visa to return to

Accordingly, we hold that the BIA applied an erroneous legal standard in reaching its determination that Mrs. Phinpathya failed to meet the continuous presence requirement.

Our next inquiry is whether the BIA properly concluded that Mrs. Phinpathya was not of good moral character during the seven years preceding her application for suspension of deportation. 8 U.S.C. section 1101(f)(6) provides, *inter alia*:

> (f) For the purposes of this chapter—No person shall be regarded as, or found to be, a person of good moral character, who during the period for which good moral character is required to be established, is or was—
>
> > (6) one who has given false testimony for the purpose of obtaining any benefits under this Chapter ...."

The Immigration and Naturalization Service contends that Mrs. Phinpathya gave "false testimony for the purpose of obtaining ... benefits under this chapter," and thus was not of good moral character. We disagree.

 Specifically, the Service points to three instances in which Mrs. Phinpathya gave "false testimony."[7] First, she stated on her application for suspension of deportation that she had made no departures from the United States since the time of her first entry. Although clearly false, the statement on her application did not constitute "testimony" within the meaning of sections 1101(f)(6) and 1254(a)(1). The term testimony does not encompass all state-

the United States in 1974. Since the Service implicitly concedes that the statements made to the American Consulate in Bangkok were not "for the purpose of obtaining any benefit under this chapter," we do not consider whether she gave "false testimony" in that instance. Moreover, since the BIA did not rely on Mrs. Phinpathya's allegedly false statements on her visa application, we are unable to affirm the order of the BIA on that ground. *F.P.C. v. Texaco*, 417 U.S. 380, 397, 94 S.Ct. 2315, 2326, 41 L.Ed.2d 141 (1974); *Patel v. INS*, 638 F.2d 1199, 1201 (9th Cir. 1980).

ments, or even all statements made under oath. Testimony means a statement made by a witness under oath for the purpose of establishing proof of a fact to a court or tribunal. *People v. Gilbert*, 217 Cal.App.2d 662, 666, 31 Cal.Rptr. 920 (1963); *State v. Schifsky*, 243 Minn. 533, 69 N.W.2d 89, 93 (1955); Black's Law Dictionary 1324 (5th ed. 1979). It is distinguished from statements made under different circumstances, and from evidence derived from writings and other sources. *State v. Ricci*, 107 R.I. 582, 268 A.2d 692, 697 (1970).

Had Congress intended sections 1101(f)(6) and 1254(a)(1) to encompass all statements, or even all statements under oath, it would have so provided. When Congress intends that a statutory provision apply to all statements rather than just testimony, it has said so explicitly. For example, 18 U.S.C. § 1001 provides that "[w]hoever, in any matter within the jurisdiction of any department or agency of the United States ... falsifies ... or makes any false, fictitious or fraudulent statements or representations, or makes or uses any false writing or document ... shall be fined ... or imprisoned ...." *See, also*, 18 U.S.C. §§ 1002–1027.[8] By limiting sections 1101(f)(6) and 1254(a)(1) to "false testimony," Congress deliberately provided that only a narrow class of statements and representations would constitute conclusive proof of lack of good moral character. The drastic consequences of the statute, which renders an alien who has given false testimony automatically ineligible for suspension of deportation, provides further support for a narrow interpretation of "false testimony."

■ Giving the term "false testimony" its ordinary meaning, as we do here, does not deprive the BIA of its discretion, or the opportunity to consider the significance of false statements. Under the statute, even if eligibility is found to exist, the BIA must then decide, in its discretion, whether to grant the alien's request for suspension of deportation. In its determination of wheth-

er suspension of deportation is appropriate, the INS may weigh numerous factors, including false statements made by the alien. Thus, rejecting the harsh and sweeping interpretation of the term "false testimony" offered by the BIA creates no conflict with the Congressional purpose which underlies the statute.

Since Mrs. Phinpathya's written statement on her application for suspension of deportation is not a statement made by a witness under oath to establish proof of a fact to a court or tribunal, we hold that her statement is not "false testimony" within the meaning of the statute.

■ Second, at the deportation hearing, when Mr. and Mrs. Phinpathya were asked if it were true that they had not been out of the United States since their initial entries, the record shows the answer, "Yes, that's true." The answer is not followed on the record, however, by the parenthetical, "by both," as is every other answer to a question directed to both petitioners. The immigration judge noted that "it is possible that only one of the two respondents [petitioners herein] answered the question," and thus concluded that the record does not support a finding that Mrs. Phinpathya responded to the question. In so concluding, the immigration judge considered the testimony of the alternate trial attorney of the Service that Mrs. Phinpathya had indeed responded, but, apparently, gave it little weight. Although we are directly reviewing the order of the BIA, the determination made by the immigration judge deserves to be given much weight. *See Espinoza-Ojeda v. INS*, 419 F.2d 183 (9th Cir. 1969). The immigration judge was a witness to the specific event in question. Moreover, he was in the best position to evaluate the accuracy of the alternate trial attorney's recollection. After review of the record, we agree with the immigration judge's conclusion that the record does not support a finding that Mrs. Phinpathya gave "false testimony."

---

8. Even section 1001 is more limited than might appear from a literal reading of the provision.

*See e.g., United States v. Bedore*, 455 F.2d 1109 (9th Cir. 1972).

Third, the Service claims that Mrs. Phinpathya gave "false testimony" when, at the deportation hearing, she testified that all statements on her application for suspension of deportation were true. The BIA, however, in concluding that Mrs. Phinpathya was not of good moral character, neither referred to, nor relied on, her testimony affirming the truth of her application. A decision rendered by an administrative agency "must be upheld, if at all, 'on the same basis articulated in the order by the agency itself.'" *F.P.C. v. Texaco, Inc.*, 417 U.S. 380, 397, 94 S.Ct. 2315, 2326, 41 L.Ed.2d 141 (1974) (*quoting Burlington Truck Lines, Inc. v. United States*, 371 U.S. 156, 168–69, 83 S.Ct. 239, 245–46, 9 L.Ed.2d 207 (1962)). This court has recognized the application of this principle in the context of immigration proceedings. *Patel v. INS*, 638 F.2d 1199, 1201 (9th Cir. 1980); *Castillo-Felix v. INS*, 601 F.2d 459, 462 n.6 (9th Cir. 1979). Since we are reviewing the order and decision of the BIA, we may not affirm on the basis of Mrs. Phinpathya's testimony as to the truth of the statements in her application, and it is thus unnecessary to consider whether that testimony was "false testimony" within the meaning of the statute. Under the circumstances of this case, remand for consideration of whether Mrs. Phinpathya's testimony regarding the truth of the statements in her application was "false testimony" is appropriate.

In summary, we hold that (1) the BIA applied an erroneous legal standard in its determination that Mrs. Phinpathya failed to satisfy the seven years physical presence requirement, and (2) the BIA erred in its determination that Mrs. Phinpathya failed to satisfy the good moral character requirement. Accordingly, we reverse the order of the BIA as to Mrs. Phinpathya and remand with instructions to reconsider the questions of seven years continuous presence and good moral character.

*Disposition*

The order of the BIA is reversed as to both petitioners and remanded for proceedings consistent with this opinion.