**Teresa M. MEDINA, Petitioner,**

v.

**Alberto R. GONZALES, Attorney General of the United States,[1] Respondent.**

**Docket No. 02–4896.**

United States Court of Appeals, Second Circuit.

Argued: Feb. 24, 2005.

Decided: April 14, 2005.

1.   Pursuant to Federal Rule of Appellate Procedure 43(c)(2), Attorney General Alberto R. Gonzales is automatically substituted for former Attorney General John Ashcroft as the respondent in this case.

630

Appearing for Petitioner: Stanley H. Wallenstein (Alan Michael Strauss, of counsel), Law Office of Stanley H. Wallenstein, New York, NY.

Appearing for Respondent: Andrew M. McNeela, Assistant United States Attorney (James L. Cott, Assistant United States Attorney, of counsel) for David N. Kelley, United States Attorney for the Southern District of New York.

Before: LEVAL, CABRANES, KATZMANN, Circuit Judges.

KATZMANN, Circuit Judge.

The central question presented by this petition is whether false oral statements made under oath during an asylum interview can constitute "false testimony" within the meaning of 8 U.S.C. § 1101(f)(6). Because we find that Congress did not directly speak to this issue in the Immigration and Nationality Act, we consider whether the Board of Immigration Appeals ["BIA"]'s construction is permissible and hold that it is and that, as a result, any alien who makes false oral statements under oath during an asylum interview with the subjective intent of obtaining immigration benefits is *per se* ineligible for suspension of deportation due to want of "good moral character." Additionally, because we find that substantial evidence supports the determination that the petitioner gave "false testimony" within the meaning of 8 U.S.C. § 1101(f)(6), we DENY the petition for review.

## I. BACKGROUND

On September 2, 1993, the petitioner, Teresa M. Medina, filed an application for asylum and withholding of deportation. In a sworn declaration attached to that application, Medina claimed that she was seeking relief because there was a "significant probability" that, if forced to return to her native Philippines, she would "once more be subjected to persecution by the Communist [P]arty of the Philippine/New People's Army (CPP/NPA)." She thereupon described, in elaborate detail, how the CPP/NPA previously persecuted her for refusing to broadcast anti-government, pro-Communist propaganda when she worked as a newscaster with the Eagle Broadcasting Station in Quezon City.

Medina claimed that she first "drew attention" from the CPP/NPA in early 1998, when she was "enjoying a heyday" in her job with Eagle Broadcasting. At that time, Medina alleged, the CPP/NPA attempted to recruit her through "an underground faction," an attempt that left her "extremely agitated." Shortly thereafter, according to Medina, she again came into conflict with the CPP/NPA. In February 1998, two freelance photographers with whom she was acquainted—and who had encouraged her to attend what she later

discovered were CPP/NPA recruitment seminars—asked her to read an announcement during her show. Medina at first agreed to take the paper without checking the contents. When she got into the broadcasting booth, however, Medina claimed she was "shocked to discover" that what the photographers had asked her to read was a "report on military abuses, consisting of a tally of political detainees within the quarter, including names and their places of detention." Medina stated that she did not read the announcement because doing so would "get me into trouble."

Medina further stated that after the show, the photographers "furiously attacked me with words for not complying with their demand." She then claimed to have told them that their request was illegal, that complying with it would jeopardize her job, and that she could not "allow the CPP/NPA to turn [her] into a puppet on a string because [she had her own] ideals and beliefs." Thereupon, Medina claimed, the argument became "heated up to the point that the two shook [her] up and threatened [her] of harm [sic] for being arrogant and for misleading them that [she] would join their camp." Medina "begged them" to leave her alone.

After this incident, according to Medina, at the request of certain church elders, she read a "press release" on the air that, *inter alia*, "disclosed my brush with the CPP/NPA, as well as my stand against their terrorism and banditry." Her candor, Medina claimed, prompted even more harassment from the CPP/NPA, including harassing phone calls and threatening notes, all of which led her to believe she had no choice but to flee and go into hiding. While underground, Medina claimed, the CPP/NPA began visiting and harassing her family, even warning them that, if ever discovered, she would be "shot on sight." This, she alleged, led her to flee to the United States in September 1998.

On April 17, 1996, almost three years after she first filed her asylum application, Medina was interviewed by an asylum officer. During the course of that interview, Medina repeated—under oath—the story of political persecution detailed in the affidavit she had previously filed along with her asylum application. Since, however, the asylum officer deemed her "not credible in material respects"—a quite prescient determination, we might add—he declined to grant Medina asylum, and her case was thereupon referred for a hearing before an immigration judge.

The road to full hearing in the matter was quite rocky. There were numerous adjournments and, more seriously, a substitution of counsel in the wake of the immigration judge's finding that Medina was "the victim of ineffective assistance of counsel"—a finding the immigration judge made because, *inter alia*, Medina's initial counsel had failed to timely file certain documents. Full hearing on Medina's claim finally took place, however, on April 5, 1999, with Maryna Lansky, Esq. as Medina's new counsel.

On direct examination, Medina testified, *inter alia*, to her work experience in the Philippines, to her ties to the United States, and to the hardship she and her family would endure if she were deported—all of which testimony was given in support of her suspension of deportation claim.[2] On cross-examination, however,

---

2. After Medina obtained new counsel, the immigration judge, on October 31, 1997, instructed the new counsel, Maryna Lansky, Esq., to review Medina's asylum application and determine whether Medina wished to withdraw it or make any changes to her claim. In the wake of that hearing, Medina, by letter dated December 1, 1997, withdrew her application for asylum, deciding instead

counsel for the INS, Heath A. Bender, Esq., probed Medina on the statements she had initially given in support of her asylum claim. And it quickly became clear that Medina's harrowing story of political persecution was nothing more than that—a story, a total fabrication. Seizing on the fact that Medina testified, on direct examination, to having worked only at the Hyatt Hotel in the Philippines from 1985 to the time she left that country, Bender asked Medina if she had previously submitted an asylum application indicating that she was a newscaster for Eagle Broadcasting during some of that time. Medina largely evaded the question, stating, at one point, "My lawyer did that." Bender then asked whether Medina had signed the statement that described her work for Eagle Broadcasting and whether Medina had understood English at the time she filled that out. Medina answered these questions affirmatively.

Ultimately, Bender elicited an express admission from Medina that the addendum to her original asylum application was completely fabricated:

Q. Ma'am, is this application, this statement, which mostly talks about your career of broadcasting for the Eagle Broadcasting Station for 1987, and the troubles that you had as a result of that job, is that a lie? Is that made up?

A. Yes, it is made up.

Q. And you knew it was made up at the time you submitted this application, didn't you?

A. Yes. Through my lawyer's, according to my lawyer, he said he thought it would be a good thing to put on it.

Q. So, you yourself knew it was false, even though your lawyer told you to do it?

A. Yes.

Bender then elicited a further admission from Medina that she repeated her same "false story"—under oath—to an asylum officer during her asylum interview in April 1996:

Q. Okay. Now, in 1996, three years later, you had an interview with an asylum officer, isn't that true?

A. That's correct.

Q. And during that interview, or at the time of that interview, you were sworn to tell the truth before that asylum officer, is that right?

A. Correct.

Q. And did you in fact tell the truth to that asylum officer?

A. Well I told (inaudible) whatever is in the papers that my lawyer coached me to.

Q. So, you told the asylum officer a false story, is that right?

A. Whatever I read.

Q. Well, just answer yes or no. Did you tell him the false story?

A. Yes.

When pressed to explain why she gave false statements to the asylum officer, Medina stated that her attorney at the time, Avelino Halagao, Esq., "told me that this should work for a political asylum status," and she obliged his entreaties to "say whatever is in the papers" because she "just wanted to be able to work here in the United States. And he told me that this would be a good way. I didn't mean to lie."

to seek only suspension of deportation (a form of relief she had requested at a prior hearing

in October 1996).

On February 4, 2000, the immigration judge held that while Medina had satisfied the continuous physical presence and extreme hardship requirements for suspension eligibility, she could not establish that she was a person of good moral character. This was because, the immigration judge explained,

> [t]he respondent, in essence, has admitted in testimony before this Court that when she appeared at an asylum interview in 1996, the respondent essentially presented false testimony to an asylum officer. This was sworn testimony that the respondent gave. The respondent explained that at the time of the asylum interview, she testified under oath consistently with information in her asylum application but that the information in her asylum application had been essentially made up by her prior attorney and that she knew that the asylum application contained this false information.

The immigration judge held that, in light of the BIA decision *In re R–S–J–*, 22 I & N Dec. 863 (BIA 1999)—a decision that interpreted the then-relevant provisions of the Immigration and Nationality Act ("INA" or "Act")—he was compelled to find that Medina had given "false testimony" and precluded from finding that she possessed the requisite good moral character under the Act.

On November 12, 2002, the BIA dismissed Medina's appeal from the immigration judge's decision, finding that the immigration judge had correctly applied the law articulated in *In re R–S–J–* and further finding that, even if Medina's prior counsel had provided her with ineffective assistance by coaching her to lie, "this would not excuse [her] from [the requirement of] testifying honestly in the asylum interview." Medina now petitions for review of this decision.[3]

## II. DISCUSSION

On appeal, Medina principally argues that: (1) contrary to the BIA's interpretation of the INA, false statements given under oath during an asylum interview cannot qualify as "false testimony" under the Act; and (2) even if false statements given under oath during an asylum interview *can* qualify as "false testimony," the record does not adequately support the determination that Medina gave such statements.

■ To the extent that Medina challenges the BIA's construction of the "false testimony" provision of the INA, our inquiry is governed by the standards set forth in *Chevron U.S.A. Inc. v. Natural Resources Defense Council, Inc.*, 467 U.S. 837, 104 S.Ct. 2778, 81 L.Ed.2d 694 (1984). *See INS v. Aguirre–Aguirre*, 526 U.S. 415, 424, 119 S.Ct. 1439, 143 L.Ed.2d 590 (1999) (holding that where a "Court of Appeals confront[s] questions implicating '[the BIA's] construction of the statute which it administers,' the court should [apply] the principles of deference described in *Chevron* ...". That means if Congress has "directly spoken to the precise question at issue" and "the intent of Congress is clear, that is the end of the matter; for the court, as well as the agency, must give effect to the unambiguously expressed intent of Congress." *Chevron*, 467 U.S. at 842–43, 104 S.Ct. 2778. If, however, we determine that the statute is silent or am-

---

3. Because Medina's deportation proceedings commenced before April 1, 1997 and the final order in her case was issued after October 30, 1996, we have jurisdiction to consider her petition pursuant to the transitional rules of the Illegal Immigration Reform and Immigrant Responsibility Act of 1996 ("IIRIRA"), Pub.L. No. 104–208, § 309(c)(1), 110 Stat. 3009, 3009–546, 3009–625, which preserved jurisdiction under 8 U.S.C. § 1105a(a) (repealed 1996) in cases such as these. *See Secaida–Rosales v. INS*, 331 F.3d 297, 306 n. 1 (2d Cir.2003).

biguous with respect to the specific question at issue, then we must consider "whether the agency's answer is based on a permissible construction of the statute." *Id.* at 843, 104 S.Ct. 2778. If it is a permissible construction, we must defer to it. *See id.; New York & Public Serv. Comm'n of New York v. FCC,* 267 F.3d 91, 105 (2d Cir.2001).

■ To the extent that Medina challenges the factual determination that she gave "false testimony" and therefore lacked good moral character and was ineligible for suspension of deportation, we review that determination for substantial evidence. *See Bernal v. INS,* 154 F.3d 1020, 1022 (9th Cir.1998).

### 1. The Challenge to the BIA Interpretation of "False Testimony"

In order to become eligible for suspension of deportation under the INA,[4] an alien must satisfy three statutory prerequisites: (1) she must have been physically present in the United States for a continuous period of not less than seven years immediately preceding the date of her suspension application; (2) she must prove that during this period she was—and continues to be—a person of "good moral character;" and (3) she must be a person whose deportation would, in the opinion of the Attorney General, result in extreme hardship to her or a spouse, parent, or child who is a citizen of the United States or an alien lawfully admitted for permanent residence. *See* 8 U.S.C. § 1254(a)(1) (repealed).

Under the INA, seven classes of aliens are *per se* disqualified from satisfying the

"good moral character" prerequisite. *See* 8 U.S.C. § 1101(f). Among these are aliens who, "during the period for which good moral character is required to be established," gave "false testimony for the purpose of obtaining any benefits under this Act." 8 U.S.C. § 1101(f)(6).

The Supreme Court has held that the term "testimony," as employed in 8 U.S.C. § 1101(f)(6), is "limited to oral statements made under oath" and "does not include 'other types of misrepresentations or concealments, such as falsified documents or statements not made under oath.'" *Kungys v. United States,* 485 U.S. 759, 780, 108 S.Ct. 1537, 99 L.Ed.2d 839 (1988).

■ What the parties dispute is whether, as the BIA decided, oral statements made under oath during an asylum interview are "testimony" within the meaning of 8 U.S.C. § 1101(f)(6). In our view, the INA is ambiguous with respect to this specific question. There is considerable disagreement among authorities about the precise scope and meaning of the term "testimony." Some authorities, for example, define the term "testimony" broadly enough to encompass virtually any statements made under oath—whether they are made during an Article III trial, before a congressional committee, or at a hearing held by an administrative agency to receive public commentary on a proposed rule. *See, e.g.,* WEBSTER'S INTERNATIONAL DICTIONARY OF THE ENGLISH LANGUAGE 1788 (3d ed.1993) (defining "testimony" to mean, *inter alia,* "a solemn declaration [usually] made orally by a witness under oath in response to interrogation by a lawyer or authorized public official"); AMERICAN HER-

<hr/>

**4.** Among IIRIRA's numerous changes to the INA was its repeal of the form of relief petitioner seeks here, *viz.,* suspension of deportation, its creation of a new form of deportation proceeding known as "removal," and its addition of a new form of discretionary relief from removal known as "cancellation of removal,"

*see* IIRIRA § 304(a)(3) (amending the INA to add, inter alia, § 240A(a) & (b), codified at 8 U.S.C. § 1229b(a) & (b) (2000)). The INA was, however, in effect at the time that Medina sought immigration relief and accordingly, as all parties agree, the INA governs the instant matter.

ITAGE DICTIONARY OF THE ENGLISH LANGUAGE 1788 (4th ed.2000) (defining "testimony" to mean, *inter alia,* "[a] declaration by a witness under oath, as that given before a court or deliberative body"). Other authorities more narrowly define "testimony" to apply only to statements made under oath in certain types of proceedings—but these authorities disagree as to which types. *Compare Bernal v. INS,* 154 F.3d 1020, 1022–23 (9th Cir.1998) ("Testimony means a statement made by a witness under oath for the purpose of establishing proof of a fact to a court or tribunal.") (quoting *Phinpathya v. INS,* 673 F.2d 1013, 1019 (9th Cir.1981)) *with Sharaiha v. Hoy,* 169 F.Supp. 598, 601 (S.D.Cal.1959) (construing "testimony" to mean "the oral utterances of witnesses under oath" made in the course of a "judicial or quasi-judicial proceeding"). And lest there be any doubt about the breadth of the dissensus, we note that the veritable *Black's Law Dictionary* has, itself, offered two remarkably conflicting definitions of the term "testimony" in recent years. *Compare* BLACK'S LAW DICTIONARY 1476 (6th ed.1990) (defining "testimony" to mean, *inter alia,* "evidence that comes to [a] tribunal through live witnesses speaking under oath or affirmation in [the] presence of [a] tribunal, judicial or quasi-judicial") *with* BLACK'S LAW DICTIONARY 1514 (8th ed.2004) (defining "testimony" to mean, *inter alia,* "[e]vidence that a competent witness under oath or affirmation gives at trial or in an affidavit or deposition.").

Given these divergent views about the precise scope and nature of "testimony," we cannot say that the INA's use of the word "testimony" clearly and unambiguously encompasses—or excludes—oral statements made under oath during an asylum interview. Thus, because we find that Congress has not "directly spoken" to the precise question here at issue, *Chevron,* 467 U.S. at 842, 104 S.Ct. 2778, we consider "whether the agency's answer is based on a permissible construction of the statute." *Chevron,* 467 U.S. at 843, 104 S.Ct. 2778. We hold that it is.

The BIA has reasonably supported its determination that a false statement under oath during an asylum interview is false testimony in the context of the statute. In *In re R–S–J–,* the BIA noted that "where false statements are uttered orally under oath, they have been held to constitute false testimony," and that "such statements need not be uttered in administrative or judicial proceedings, but can include statements made under oath to government officials, including Service officers and consular officials." *In re R–S–J–,* 22 I. & N. Dec. at 865. Because that particular case arose in the Ninth Circuit and the Ninth Circuit had previously ruled that such oral statements must be made "to a court or tribunal," *Phinpathya v. INS,* 673 F.2d 1013, 1018–19 (9th Cir. 1981), the BIA went on to observe that the Ninth Circuit had more recently "held that false statements made under oath during a naturalization examination constitute false testimony" within the statute. *In re R–S–J–,* 22 I. & N. Dec. at 866 (citing *Bernal v. INS,* 154 F.3d 1020 (9th Cir.1998)).

The BIA also reasoned that an asylum officer possesses what, in the BIA's view at least, are the "fundamental attributes" of an administrative tribunal, namely, "its authority to hear and decide; its administrative nature; and its authority to render judgments in accordance with the facts and the law." *In re R–S–J–,* 22 I & N Dec. 863, 866–67 (BIA 1999) (citing WEBSTER'S THIRD NEW INTERNATIONAL DICTIONARY 2441 (P. Gove ed.1986); BLACK'S LAW DICTIONARY 46 (6th ed.1990); and *United States ex rel. Alaska Smokeless Coal Co. v. Lane,* 250 U.S. 549, 551, 40 S.Ct. 33, 63 L.Ed. 1135 (1919)). To wit, the BIA noted that an asylum officer possesses " 'profes-

sional training in country conditions, asylum law, and interview techniques,' " (quoting IIRIRA § 235(b)(1)(E)(i)), and is, moreover, vested with numerous adjudicative powers including the power to administer oaths, the power to take and consider evidence, the power to compel testimony by subpoena, and even the power to grant withholding of deportation and asylum.[5] *In re R–S–J–*, 22 I & N Dec. at 867–68.

To be sure, as Medina claims, asylum interviews are non-adversarial; they are untranscribed; and they might be negatively affected by the sloppy or imprecise work of translators in cases involving non-English speaking applicants. However, none of these claims persuades us that the BIA's construction of "testimony" is, itself, impermissible. *See, e.g., Mugalli v. Ashcroft*, 258 F.3d 52, 55 (2d Cir.2001) ("[I]t is not necessary that we conclude that the agency's interpretation of the statute is the only permissible interpretation, nor that we believe it to be the best interpretation of the statute. Rather, in order to affirm the BIA's determination, we need only conclude that its interpretation is reasonable and that it considered the matter in a detailed and reasoned fashion.").

First, we see no reason why oral statements must, as a matter of law, be made in adversarial proceedings in order to qualify as "testimony." Experience teaches us that it is not uncommon for courts and tribunals to conduct proceedings that are non-adversarial; for example, the fact that a will may go uncontested does not render

proceedings before New York Surrogate's Court something other than judicial in character. Second, we fail to see why the lack of transcription implicates, let alone undermines, the testimonial nature of statements. As the BIA rightly noted in *In re R–S–J–*, "[n]either the act of transcription nor the existence of a written transcript confers *testimonial* character upon the evidence." *R–S–J*, 22 I & N. Dec. at 872 (emphasis added). Indeed, all the lack of transcription may do is raise evidentiary questions about whether an applicant has, in fact, given false testimony. *See id.* at 872 (stating that the argument that asylum interviews are untranscribed "seems more directed at the burden of proving whether false testimony has occurred in the course of an asylum officer interview"). And the same can be said in response to Medina's claim that sloppy translation may compromise the accuracy of any statements recorded by the asylum officer at the asylum interview: the translation problem may raise an evidentiary issue, but it does not make the statements under oath any less "testimonial."

Finally, we note that precedent supports the construction we here permit. The Ninth Circuit has, for example, reached precisely the same conclusion that the BIA reached in *In re R–S–J–*. In *Ramos v. INS*, that Court expressly held that false statements made during an asylum interview can constitute "false testimony" within the meaning of 8 U.S.C. § 1101(f)(6) and that, accordingly, an applicant lacks "good

---

5. Medina argues that asylum officers lack the power to make binding decisions and for that reason, among others, statements given during an asylum interview cannot be considered "testimony" within the meaning 8 U.S.C. § 1101(f)(6). It is indeed true that asylum officers do not have binding power to *deny* immigration relief; if an asylum officer believes an alien is not eligible for asylum or withholding of deportation, the matter is referred to an immigration judge. However,

the asylum officer unquestionably does have the power to *grant* relief. *See* 8 C.F.R. § 208.14(b) (providing that "an asylum officer may grant, in the exercise of his or her discretion, asylum to an applicant" who satisfies the necessary requirements). That power, coupled with the other powers described by the BIA in *In re R–S–J–* certainly supports the BIA's determination that statements given during an asylum interview can be considered "testimony" within the meaning of the Act.

moral character" for having given such false statements. *See Ramos v. INS*, 246 F.3d 1264, 1266 (9th Cir.2001). Other courts, as well, have held that statements need not be uttered in formal administrative or judicial proceedings in order to be considered "testimony." *See In re R–S–J–*, 22 I & N Dec. at 865–66 (collecting cases). Indeed, well over thirty years ago, we ourselves indicated that a naturalization applicant gave "false testimony," within the meaning of 8 U.S.C. § 1101(f)(6), by making false statements under oath during his "preliminary examination," i.e. during his naturalization interview. *See In re Yao Quinn Lee*, 480 F.2d 673, 676 (2d Cir.1973).

█ We conclude, given the deference we must extend to the agency's construction of the statute it administers, that we must follow the BIA's interpretation that a false statement made under oath in an asylum interview is "false testimony" within the meaning of 8 U.S.C. § 1101(f)(6). Thus, for all the above reasons, we defer to the BIA's construction of 8 U.S.C. § 1101(f)(6) and hold that false oral statements made under oath during an asylum interview constitute "false testimony" within the meaning of 8 U.S.C. § 1101(f)(6). Accordingly, any applicant who makes such false statements with the subjective intent of obtaining benefits under the Act must be deemed ineligible for suspension of deportation on the ground that she lacks "good moral character."

### 2. *The Challenge to the Determination that Medina Gave False Testimony*

█ Medina claims that substantial evidence does not support the determination that she gave false statements to the asylum officer with the "subjective intent" of obtaining immigration benefits. We disagree. Medina expressly admitted during cross-examination not only that she gave false statements under oath during her asylum interview, but that the reason she made those false statements was because her attorney Halagao had indicated that "this should work for a political asylum status." In addition, Medina testified that she obliged Halagao's entreaties to "say whatever is in the papers" because she "just wanted to be able to work here in the United States. And he told me that this would be a good way." Medina's testimony leaves little room for doubt about her rationale for giving false statements during the asylum interview. The false statements, so essential to her initial asylum application, were total fabrications that Medina deliberately made because she believed they would enhance her chances of securing immigration relief.[6] Thus, we conclude that the immigration judge's determination that Medina gave "false testimony" within the meaning of 8 U.S.C. § 1101(f)(6)—a determination with which the BIA concurred—is supported by substantial evidence in the record. *See Bernal v. INS*, 154 F.3d 1020, 1022 (9th Cir. 1998).

For the foregoing reasons, the petition for review is **DENIED**.

█

---

**6.** Moreover, we agree with the BIA that even assuming, *arguendo*, Medina's initial counsel provided ineffective assistance, this would not excuse Medina from her obligation to testify truthfully during the asylum interview, given that she took an oath to tell the truth during that interview and there is no reason to doubt that she understood all that the oath required.